## A10A0184. WARD v. THE STATE.
(696 SE2d 471)

ADAMS, Judge.

Lavalis Sentell Ward appeals his conviction and sentence on multiple counts of armed robbery, aggravated assault, false imprisonment, possession of a firearm during the commission of a crime, burglary, and terroristic threats, as well as the denial of his motion for new trial.

Because Ward raises serious challenges about whether the testimony of an accomplice was corroborated, we present the facts of this case as presented to the jury by the individual witnesses. This will also highlight several incidents of alleged ineffective assistance of counsel.

*The April 14, 2007 Incident*

Margaret Katherine Neighbors testified that she and Ward met in March 2007 and entered into a relationship. She testified that Ward goes by the name "Vilo," and that she loved him. She testified without objection that on or before April 14, 2007, she purchased a .40 caliber gun at a pawn shop at Ward's request because he had a felony record and could not purchase one for himself. Ward provided the money and selected the weapon, but she went in the store by herself and bought the gun in her name. She gave the gun to Ward. She also purchased bullets at Ward's request, as well as latex gloves and bandanas, and gave those items to him. On the night of April 14, 2007, she waited for Ward at her sister's house, and at about 3:00 a.m., Ward called to make sure she was dressed in black, and he came by to pick her up. Ward then explained that he knew men who were selling drugs and that he and Neighbors were going to take some of the drugs. The two then went to a house on Hitt Drive in Whitfield County, across the street from Ward's mother's home. There were

men talking inside, and Ward, who had the gun, simply opened the door, walked in, pointed the gun "at the men in the house," ordered everybody to get on the ground, and announced that it was a robbery. Neighbors did not know any of the people in the house.

Neighbors said that Ward ordered one man to get on the ground, and told Neighbors to check the pockets and to get money and cell phones. One man remained standing, and Ward demanded that he show where the drugs and money were. Neighbors testified that Ward saw a clip of ammunition for a gun and asked for the weapon, and someone produced a 9 millimeter gun. Someone also handed over a bag of "weed" and a bag of cocaine, but Ward demanded more. Someone said the money and drugs were at another apartment, and, as Neighbors explained, "we go there. Put everybody in the car and we go there." But nothing was found there, so the group returned to "their house." Ward then had Neighbors guard the men with both guns while he went to one of the bedrooms and searched for more money and drugs. Neighbors testified that Ward found a woman and a little boy in one of the bedrooms and that he threatened to cut off the boy's finger if the victims did not produce more money and drugs. Ward stabbed one of the men in a similar effort; that man then ran out of the house. Ward ran after him and fired his gun, then Neighbors and Ward left. They had stolen about $600, some cocaine and some marijuana. Neighbors also testified that she lived at Ward's mother's house just prior to her arrest, but Ward lived somewhere else.

On or about May 29, 2007, Neighbors was arrested and agreed to speak with the police. She initially denied that she and Ward were involved in the crime. But eventually she admitted being there and she named Ward. Neighbors testified that she and Ward wrote letters to each other and communicated in other ways while they were both in jail. She identified Ward's handwriting in two handwritten letters, and also identified a letter she wrote to Ward. She read her letter to the jury, in which, among other things, she implicated Ward in a separate matter at "Avenue F"; she wrote that Ward had put the gun at his mother's house; and she suggested that Ward had set her up for the crime:

> I pretty much told them what happened. I had it in my head that they already had us. I wish we had discussed the possibility of us getting caught and what to do in that situation. . . . You left bullets in the wall off Avenue F, then you put the gun at your mama's house where I was staying when they got me. So, the gun that's in my name was used in the robbery and wasn't more than 20 feet away from me,

and I'm saying it's stolen. That makes me think you set me up. . . .

She read one of the letters from Ward, in which, among other things, he suggested that he lived by a code of looking out for his "lafamilia" and that he wanted her to change her plea and to deny that he was involved "with anything":

> . . . I want you to tell me if you still down with me or not. Are you still down with me?. . . I was about to go home but then they brought all this bull shit up on me because of your statements . . . "My life is in your hands . . . Don't you ever shoot me down like that. You know I live by a code, . . . and I look out for my 'lafamilia.' . . . If I would have told on myself when them folks picked me up, you can bet your ass I wouldn't have thought about saying your name. . . ." I want you to change your plea to not guilty because we can get you off . . . you say in your letter that you will not testify against me. Well, you need to go ahead now and sign an affidavit saying that I had nothing to do with anything. . . . Loose lips sink ships, have you ever heard of that? If you don't say nothing they ain't got nothing. . . . I never said your name so clear mine up.

In the letter, Ward referred to one of his children as "little Vilo." Neighbors also read from a second letter from Ward. Among other things, he wrote ". . . Do you really love me? Would you kill for me? Would you steal for me? . . ."

Neighbors testified that in connection with the crimes at issue, she pleaded guilty to one count each of robbery, aggravated assault, false imprisonment, and possession of a firearm and that she was exposed to a sentence of fifty-five years.

Lieutenant Mike Key of the Dalton Police Department testified that he questioned Neighbors on the evening of May 29, 2007. Key testified without objection that Neighbors initially denied any involvement but eventually "became truthful." He testified without objection that, in response to his questions, "[Neighbors] mentioned [Ward's] name . . . [and] after his name was mentioned she basically just gave up, . . . there was a chuckle and she just basically said you got me and then became truthful in regards to the information in the case." On cross-examination, Ward's counsel repeated some of the damaging statements multiple times. On further cross-examination after a recording of the Neighbors interview was played for the jury, Key admitted that it was he who first mentioned Ward during the interview.

When the State offered the video of the Neighbors interview, Ward's counsel objected to hearsay statements of the victims and to the cumulative and rehabilitative nature of allowing the jury to see the video after already hearing Neighbors testify. The State explained that it was tendering the video as a prior consistent statement because on cross-examination Neighbors's credibility had been called into question. The court overruled the objection and made clear that Neighbors could be brought back for additional cross-examination if Ward so desired. The video was then played.

Deputy Thompson with the Whitfield County Sheriff's office testified that at about 7:00 a.m., after receiving notice of an incident at 1620 Hitt Drive, he went to the scene. He testified that "[i]t was pretty chaotic when I first got there. I think there was about five or six individuals there, all Hispanic, from my memory." He testified that he spoke to Raul Cuevas, who he characterized as "the main victim." He also named as victims Rafael Zendejas, Jr.; Ponciano Zendejas, Jr.; Jesus Nicholas Martinez; Acevedo Ramirez; and Diego Ramirez. He testified that Acevedo Ramirez was a woman, and Diego a child less than one year old. None of the alleged victims of the April 14 incident testified.

Detective Barry Woods testified that a loaded .40 caliber gun was located in a green Ford Explorer parked at Ward's mother's house. The owner of a pawn shop in Dalton testified that he sold the same gun to Neighbors on April 13, 2007. The owner did not recall seeing Ward in the shop.

*The May 29, 2007 Incident*

Following the court's instructions regarding evidence of similar transactions, evidence was submitted regarding an incident that occurred on May 29, 2007. Hugo Lopez testified that while he was visiting his friend Barbara Pittman in Dalton, two men, one black and one white, entered wearing bandanas over their faces and demanded money; at some point, shots were fired. He testified that he thought he knew the black man as "Vilo." And he testified that he selected Ward from a photographic lineup. But he could not identify Ward in court as the perpetrator; he testified, "from what [the defendant] looks like, it don't look like him." Lopez testified that when viewing a photographic array to try to identify the perpetrators, Woods said "do you think that's who it is right there?" He testified that he couldn't say that he was afraid of Ward but that he was afraid during the incident. Although the State tried to offer the videotape of Lopez's statement as a prior consistent statement, it does not appear that the video was ever played. On cross-examination, counsel asked if, when Woods had shown him the lineup, Woods had written down the word "Vilo" on a notepad. Lopez answered "yes."

Woods then testified that when interviewing Lopez, Lopez was unable to identify anyone in the first photographic lineup, which included pictures of six black men including a suspect with initials J. C. H. Woods testified that the investigation later eliminated J. C. H. as a suspect. Woods testified without objection that Lopez then said that he recognized the black male from the scene, and that he went by the name "Vilo." Woods denied mentioning the name "Vilo" before Lopez did. Woods testified that he put Ward in a second photographic array because of what Lopez said. But on cross-examination, Ward's counsel got Woods to admit that he was out of the room when another officer and Lopez discussed "Vilo," and that that officer had written the word "Vilo" on the notepad. Finally, Woods testified without objection that Lopez pointed at Ward's picture and stated, "I don't want anything to do with . . . please, man, this guy is dangerous . . . he's dangerous." Woods added that Lopez said he was 100 percent sure of the identification.

Another officer testified that at the location of the similar transaction at 930 Avenue F in Dalton, he recovered bullets and cartridge casings. The firearms examiner at the GBI Crime Lab at the time testified that one of the recovered bullets was fired from the weapon recovered from the car located at Ward's mother's home.

Ward testified in his own defense and denied both crimes. He admitted that he and Neighbors had a sexual relationship. He testified that she lived at his mother's house briefly but that he did not live there at the same time. He admitted that he goes by the name "Vilo" in his rap songs, and he admitted he also calls his little boy "Vilo." He denied that he wrote the letters, but the State got Ward to admit the authenticity of his signature on another document in an attempt to show the jury that his handwriting matched the letters.

Ward was convicted on three counts of armed robbery, one count of kidnapping, six counts of aggravated assault, five counts of false imprisonment, four counts of possession of a firearm during the commission of a crime, one count of burglary and one count of making a terroristic threat. The trial court granted Ward's amended motion for new trial with regard to the kidnapping count but denied the remainder.

1. Ward first contends the convictions must be set aside for insufficient evidence.

(a) Ward contends there is no evidence to establish that any of the victims was harmed in the manner alleged in the three counts of armed robbery. In Count 1, Ward was charged with taking a wallet and currency from Raul Cuevas. In Count 2, he was charged with taking a pocket knife from Ponciano Zendejas, Jr. In Count 3, he was charged with taking currency from Rafael Zendejas, Jr. The only

related evidence was Neighbors's testimony that with the use of a gun, she took a pocket knife from "one of the guys"; that she and Ward took stuff from "them"; that she held the men at gunpoint; that she took items from the men's pockets; that she and Ward took a sack of weed and a sack of cocaine; and that they took about $600 and some drugs from the premises. The State did not present any evidence to show what had been taken from whom and none of the victims testified.

"[T]he identity of the person alleged to have been robbed is not an essential element of the crime and need not be proved by direct evidence." *McKisic v. State*, 238 Ga. 644, 646 (2) (234 SE2d 908) (1977). Also, "[r]obbery is a crime against possession, and is not affected by concepts of ownership." (Citation and punctuation omitted.) *Carter v. State*, 156 Ga. App. 633 (3) (275 SE2d 716) (1980). Thus, it does not matter exactly whose property was taken so long as it was taken from a "person or the immediate presence of another." OCGA § 16-8-41. "A victim's 'immediate presence' in the context of our armed robbery statute . . . extends 'fairly far,' and a robbery conviction is usually upheld as to a taking even out of the physical presence of the victim, if what was taken was initially under the victim's control or his responsibility." *Smith v. State*, 261 Ga. App. 25, 25-26 (1) (581 SE2d 673) (2003).

Here, there is evidence that the items were taken from the men or "them," as well as evidence that there were four men in the immediate area at the time. Although the State did not show that the specific people named in the indictment were robbed,

> [t]he general rule that allegations and proof must correspond is based upon the requirements (1) that the accused is definitely informed of the charges against him so he can present his defense and not be surprised by the evidence at trial, and (2) that he is protected against another prosecution for the same offense.

(Citation omitted.) *Johnson v. State*, 293 Ga. App. 32, 34 (1) (666 SE2d 452) (2008). That rule has not been violated here. There is evidence that items were taken from at least three men by use of a gun. "[I]f property is taken from the immediate presence or the actual or constructive possession of more than one victim, 'the defendant may be charged with the robbery of each victim.' *Green v. State*, 265 Ga. App. 126, 128-129 (2) (592 SE2d 901) (2004)." *Harp v. State*, 302 Ga. App. 17, 18 (690 SE2d 424) (2010). Accordingly, the evidence was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Ward committed three armed robberies. See *McKisic*, 238 Ga. at 646 (2) (police officer testified to

the name of the victim, which was the name alleged in the indictment).

(b) In Counts 5 through 10, Ward was convicted of aggravated assault against Cuevas by shooting at him with a gun; against Cuevas by stabbing him with a knife; and against Acevedo Ramirez, P. Zendejas, R. Zendejas, and J. Martinez by pointing a gun at them. Ward contends there is insufficient evidence to support these counts because there is no evidence that a gun was specifically pointed at any of them.

Evidence showed that Ward and Neighbors pointed one or two guns "at the men in the house," that Ward stabbed one of the men, and that Ward shot at that same man as he ran out of the house. No evidence was presented to show that Ward or Neighbors pointed or otherwise used a gun in connection with Acevedo Ramirez, the young woman. Accordingly, that conviction must be reversed.

The person stabbed and shot at was not identified in the evidence, but there was evidence that Ward stabbed and shot at the same person and that Raul Cuevas was the "main victim." Raul Cuevas was the only person listed as a victim of these crimes in the indictment. There was evidence that Ward and Neighbors pointed a gun at the men in the house, and an officer testified to their names. Therefore the remaining counts of aggravated assault against the male victims are affirmed. See *McKisic*, 238 Ga. at 646 (2). Moreover, like above, Ward has not shown the requisite harm arising out of a claim that the allegations and proof fail to correspond. See *Johnson,* 293 Ga. App. at 34 (1). Finally, the case of *Everett v. State*, 216 Ga. App. 444 (454 SE2d 620) (1995), is not controlling. In that case the State was required to prove a cause and effect relationship; it was required to show that the defendant caused the death of another person, yet the State failed to prove that the victim named in the indictment died, or that he died as a result of the defendant's actions. Id. at 445.

(c) Ward also contends his five convictions for false imprisonment must be reversed for the same reason — that there was no evidence identifying whom he falsely imprisoned. "A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority." OCGA § 16-5-41 (a). Neighbors's testimony shows that she kept all the men at gunpoint while Ward searched the house. The evidence showed that there were four men in the house and an officer testified as to their names. See *McKisic*, 238 Ga. at 646 (2). There was no evidence regarding false imprisonment of the woman. In fact, the evidence showed that she was hidden in a bedroom at the beginning of and for a significant portion of the incident and until the group returned from the second location.

Therefore, we reverse the conviction related to falsely imprisoning Acevedo Ramirez, but affirm the convictions related to the male victims.

2. Ward contends that his conviction of possession of a firearm during the commission of kidnapping (Count 17) must be reversed because the trial court granted his motion for new trial of the kidnapping charge. The trial court held that the guilty verdict for kidnapping was against the weight of the evidence. Although inconsistent verdicts in criminal cases need not be set aside, *Kimble v. State*, 236 Ga. App. 391 (512 SE2d 306) (1999), where a court determines that a predicate offense must be set aside and explains its reasoning, the policy behind the abolition of the rule against inconsistent verdicts is not applicable. *King v. Waters*, 278 Ga. 122, 123 (1) (598 SE2d 476) (2004). Because we know the trial court's reasoning on the kidnapping charge, it follows that the dependent firearm possession charge should also be reversed.

3. Ward contends that his conviction of burglary must be set aside because there is no evidence to establish that the address of 1620 Hitt Street was the dwelling of Raul Cuevas, as was alleged in the indictment. "All that the law required was that the indictment should identify the dwelling broken and entered with burglarious intent, and that it should show that it was not the dwelling of the party so breaking and entering, but that it was occupied by the prosecutor." (Citations and punctuation omitted.) *Murphy v. State*, 238 Ga. 725, 728-729 (2) (234 SE2d 911) (1977). Here, the evidence showed that the victims, not Ward, occupied the premises. We find no error.

4. Ward contends that each count must fail for lack of corroboration.

"[I]n . . . felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient." OCGA § 24-4-8. "The law is settled in Georgia that the corroborating facts or circumstances must connect the defendant to the crime or lead to the inference that he is guilty, and that such corroboration must be independent of the accomplice's testimony." (Citations and punctuation omitted.) *Birt v. State*, 236 Ga. 815, 824 (2) (225 SE2d 248) (1976). "The corroborating evidence may consist entirely of circumstantial evidence and may include defendant's conduct before and after the crime was committed." (Footnote omitted.) *McDaniel v. State*, 289 Ga. App. 722, 723 (1) (658 SE2d 248) (2008). "[C]orroboration requires only slight evidence from an extraneous source identifying the accused as a participant in the criminal act." (Punctuation and footnote omitted.) *Clark v. State*, 294 Ga. App. 331, 333 (670 SE2d 131) (2008). But wholly independent "similar transactions" are not sufficient corroboration. *Perryman v. State*, 63 Ga.

App. 825, 826-827 (12 SE2d 392) (1940). Finally, "[t]he sufficiency of the corroborating evidence is a matter for the jury." (Citations omitted.) *Terrell v. State*, 271 Ga. 783, 786 (3) (523 SE2d 294) (1999).

Here, the State presented evidence that Ward was identified as a participant in the second robbery — the similar transaction — and that the gun used in that crime was also the gun that Neighbors bought and used in the crime at issue. Ward admitted that he knew and had a relationship with Neighbors. And although there was another perpetrator involved in the similar transaction, in her statement to police, Neighbors denied knowing that person. Also, Ward's letters to Neighbors reflected a guilty knowledge on his part, implied that the two should cooperate to stay out of trouble, and reflected a need to live by a code of protecting one another. Ward's statement in the letter that "If I would have told on myself when them folks picked me up, you can bet your ass I wouldn't have thought about saying your name" implies that he had something to hide about an incident that also involved Neighbors. And the meaning of "loose lips sink ships" is obvious. In regard to the letter, the jury was given an opportunity to compare Ward's admitted handwriting to the handwriting on the letters, which served to corroborate Neighbors's identification of Ward's handwriting. Accordingly, there was circumstantial evidence to show that Ward committed the similar transaction after the first incident; that the same gun Neighbors bought and used in the first crime was used in the second crime and ended up in a car at Ward's mother's house afterward; and that Ward was nervous and felt guilty about events that he participated in with Neighbors, whom he had only known a short time. This corroborative evidence connects Neighbors to the crimes that occurred on April 14, 2007. See *Birt*, 236 Ga. at 824-825 (2) ("corroborating facts or circumstances must connect the defendant to the crime or lead to the inference that he is guilty"). And the same evidence shows that the similar transaction was not wholly independent of the principal crime. Thus, there was sufficient corroboration of Ward as a perpetrator of the principal crime, and, ultimately, sufficient evidence to support the convictions. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

5. Finally, Ward raises several assertions that his trial counsel's performance was ineffective. To prevail on his claim of ineffective assistance of counsel, Ward must show both that trial counsel's performance was deficient and that, but for that deficient performance, there is a reasonable probability that the result of his trial would have been different. *Wilson v. State*, 286 Ga. 141, 143 (3) (686 SE2d 104) (2009).

(a) Ward claims harm in that counsel failed to properly object to the introduction of the recording of Neighbors's interrogation. When

the video of the interview was offered, Ward's counsel objected to hearsay statements of the victims and to the cumulative and rehabilitative nature of allowing the jury to see the video after already hearing Neighbors testify. The State explained that it was tendering the video as a prior consistent statement because on cross-examination, Neighbors's credibility was called into question. The court overruled Ward's counsel's objection and made clear that Neighbors could be brought back for additional cross-examination if Ward so desired. The video was then played for the jury.

On appeal, Ward asserts that the entire recording was inadmissible against him because it was not a proper prior consistent statement.[1] He also claims that counsel should have objected to other aspects of the recording including numerous references to his past criminal activity and bad character, including that he had been involved in drug trafficking and that he carried a gun all the time.

"Unless a witness's veracity has affirmatively been placed in issue, the witness's prior consistent statement is pure hearsay evidence, which cannot be admitted merely to corroborate the witness, or to bolster the witness's credibility in the eyes of the jury." (Citations omitted.) *Woodard v. State*, 269 Ga. 317, 320 (496 SE2d 896) (1998). Here, on cross-examination, counsel for Ward challenged Neighbors's motive to testify by suggesting that she expected to receive a lesser sentence for her own crimes based on her testimony against Ward.

> Because the veracity of [Neighbors] was placed in issue by cross-examination regarding [her] motives in testifying, [her] prior consistent statements were admissible, *Tuff v. State*, 278 Ga. 91 (4) (597 SE2d 328) (2004), and were not improperly admitted to bolster the credibility of [Neighbors] in the eyes of the jury.

*Warren v. State*, 283 Ga. 42, 43 (3) (656 SE2d 803) (2008). Therefore, failing to object to the statement on this ground was not ineffective assistance.

With regard to Ward's assertion that the recording of Neighbors's interview put his character in issue, "[e]vidence that is material in explaining the conduct of the witness does not become inadmissible simply because defendant's character is incidentally

---

[1] Ward also contends the recording was not admissible under OCGA § 24-3-52 ("The confession of one joint offender or conspirator made after the enterprise is ended shall be admissible only against himself."). But it is well settled "that where the co-conspirator testifies at trial and is subject to cross-examination, OCGA § 24-3-52 has no application. *Brown v. State*, 266 Ga. 633, 635 (2) (469 SE2d 186) (1996)." *Harrison v. State*, 298 Ga. App. 870, 872 (1) (681 SE2d 252) (2009).

put in issue." *Hall v. State*, 264 Ga. 85, 86 (2) (441 SE2d 245) (1994). Here, Neighbors's statement explained that she purchased a gun for Ward because he could not do so because he had a criminal record and that the purpose of the crime was to obtain drugs. Thus these statements were admissible to explain her conduct.

But several other inadmissible statements on the recording came into evidence.[2] An officer said that Ward was known to carry a gun all the time; that Ward had been identified as being involved in the similar transaction as the shooter; that Ward was involved in drug trafficking; that Ward's other girlfriend knew where the gun was; and that Neighbors did a good thing by being "honest." Counsel objected once, apparently to the comment about drug trafficking, and the court gave a curative instruction. But no other objections were lodged.

These statements, especially that Ward's other girlfriend knew where the gun was located, were clearly objectionable hearsay. Failing to object to that statement alone was deficient, especially because it linked Ward to the principal crime.

The statement that Neighbors did a good thing by being honest was also objectionable. In a related assertion, Ward contends counsel should have objected when Key testified on direct that Neighbors began the interrogation by denying that she was involved but that she then "became truthful." Key reiterated the statement later. A witness is not allowed to bolster the credibility of another witness as to whether the witness is telling the truth. *Manzano v. State*, 282 Ga. 557, 560 (3) (b) (651 SE2d 661) (2007). "Given this well-settled law, trial counsel's failure to object to this clearly objectionable testimony when it first occurred constituted deficient performance." *Mann v. State*, 252 Ga. App. 70, 72 (1) (555 SE2d 527) (2001). And given trial counsel's strategy of attempting to show that Neighbors had in fact become not truthful when she implicated Ward, the evidence was directly damaging to the defense. See, e.g., id. at 73-74 (1).

Ward's trial counsel admitted that the statement was not proper but claimed that Ward may have distracted him from hearing some of the testimony. In the order on the motion for new trial, the court found that in this and two other instances, counsel was distracted by his own client and would have objected had he not been. But that too is ineffective assistance, especially given that similar comments were on the recording, which counsel could have reviewed in advance and prepared appropriate objections, and given that there were multiple incidents where inappropriate testimony was missed. And the

---

[2] Although the State contends Ward failed to challenge these statements below, they were all raised in the hearing on the motion for new trial.

court's conclusion that counsel definitely was distracted by Ward is not supported by counsel's testimony at the hearing on the motion for new trial that he may have been distracted. Thus, the only question is whether it was sufficiently harmful under *Strickland*.

In all, even though Ward had not testified and had not placed his character in issue, the jury was allowed to hear that Ward was a drug trafficker who always carried a gun, that he was the shooter in another armed robbery, and that Neighbors was truthful when she implicated Ward in the crime at issue. See generally *Hurston v. State*, 189 Ga. App. 748, 750 (3) (377 SE2d 519) (1989) (regarding character evidence). The resulting harm will be addressed below following consideration of other alleged ineffective representation.

(b) Ward contends counsel was deficient by failing to object to hearsay testimony of the victim of the similar transaction. After Lopez, the witness to the similar transaction, testified that he identified Ward in a photographic lineup but could not identify him at trial, Woods testified about his interview of Lopez. The prosecutor asked Woods, "Okay, and what did he tell you?" Woods answered:

> He stated that he had been there to visit the female victim, Ms. Pittman. He'd been there approximately five minutes, and he stated that the door got kicked in. Said a white male, black male entered the residence, came in the bedroom that he and Pittman were in, demanding things, I can't remember. Can I look at my report for exactly what he said?

Woods went on to testify that Lopez made the following statements: "he recognized the black male"; "the subject who did it went by the nickname of Vilo"; "the person that did it is Vilo"; "it was Vilo"; "it was Vilo that did it"; and "it was Vilo." Moreover, Woods testified that Lopez said "I don't want anything to do with . . . please, man, this guy [indicating Ward's picture] is dangerous . . . right there, man, he's dangerous." Woods then repeated that Lopez said Ward was dangerous. Finally, he testified that he asked Lopez if he was 100 percent sure of his identification and that Lopez replied that he was. Ward's counsel did not object to any of this hearsay testimony even though he specifically recalled hearing the "dangerous man" testimony. At the hearing on the motion for new trial, he admitted that he should have objected.

The State argues that any objection would have been overruled because, during Lopez's cross-examination, Ward's counsel had implied that the detective had suggested which person to choose in the photographic lineup. It is true that Ward's counsel made this suggestion. But the scope of what Woods testified to greatly exceeded rebutting that implication. This is most obviously true regarding the

comment that Ward was dangerous. And the numerous recitations of hearsay that Vilo committed the similar transaction were not related to the logistics of how the photographic lineup was presented. Finally, Ward's character had not been placed in issue. So, the idea that Ward was a dangerous man was now improperly before the jury, and Lopez's testimony that Vilo committed the similar transaction was improperly bolstered.

In summary, trial counsel was ineffective by not properly objecting to evidence that Ward was a drug trafficker who always carried a gun, that he was a dangerous man, that he was the shooter in the similar transaction, and that his other girlfriend, Ammons, knew where the gun was located after the second crime. Trial counsel was also ineffective in allowing testimony by a detective bolstering Neighbors's honesty regarding implicating Ward in the crime at issue. In this case, there is not overwhelming evidence of Ward's participation in the crime. And given the serious nature of the information improperly allowed to go to the jury, we conclude that Ward has met his burden of showing a reasonable probability that the result of his trial would have been different if the harmful information had not been allowed. See, e.g., *Mann*, 252 Ga. App. at 73-74 (1). Reversal is required. Id.

Because we find that counsel was ineffective and harmful on the points addressed above, we need not address the remaining assertions of ineffective assistance of counsel.

*Judgment reversed. Smith, P. J., and Mikell, J., concur.*

DECIDED JUNE 21, 2010.

*Jimmonique R. S. Rodgers*, for appellant.
*Kermit N. McManus, District Attorney, Susan L. Franklin, Assistant District Attorney*, for appellee.