**FIRST DIVISION
ELLINGTON, C. J.,
PHIPPS, P. J., and DILLARD, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/**

**September 6, 2012**

# In the Court of Appeals of Georgia

A12A1171. SMARR v. THE STATE.

DILLARD, Judge.

Following a jury trial, Deonte Smarr was convicted on one count of burglary and one count of criminal attempt to commit burglary. He subsequently filed a motion for new trial, which the trial court denied. Smarr argues on appeal that the trial court erred in admitting similar-transaction evidence and in denying his motion for directed verdict as to the charge of attempted burglary, and further that his trial counsel rendered ineffective assistance for various reasons. Smarr also asserts that the trial court impermissibly increased his sentence after he began serving same. We agree that the trial court erred in increasing Smarr's sentence and therefore vacate that order and remand this case for resentencing; however, we affirm Smarr's convictions in all other respects.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the jury's verdict.[1] So construed, the evidence adduced at trial showed that on May 12, 2009, a deputy with the Douglas County Sheriff's Office was on routine patrol during the very early morning hours and observed three individuals dressed in all black and wearing ski masks attempting to load what appeared to be a large box onto the bed of a truck parked behind a convenience store located on Anneewakee Road (the "Anneewakee burglary"). As the deputy approached in his marked vehicle, the three individuals fled on foot and the driver of the truck led the deputy on a high-speed chase, ending only when the truck crashed into a ditch. The deputy immediately apprehended the truck's driver, Annie Freeman, and placed her under arrest; the three fleeing individuals, however, were not located at that time.

A subsequent investigation revealed that the surveillance cameras and security system at the convenience store had been disabled and that the perpetrators gained entry into the store by breaking through a glass door. They were attempting to load the store's safe into the truck when the officer arrived and thwarted their plan. Law-enforcement officers located and seized three cellular telephones and several tools,

---

[1] *Bearfield v. State*, 305 Ga. App. 37, 37-38 (699 SE2d 363) (2010).

including a sledge hammer/ax combination tool and a crowbar, from the interior of Freeman's truck following her arrest.

Freeman spent three months incarcerated, unwilling to provide investigators with any information about the Anneewakee burglary or her co-conspirators. As the investigation continued, however, the investigating officers intercepted and recorded numerous telephone calls between Freeman and an individual later identified as co-defendant Milton Davis, in which the two discussed details about the burglary and Freeman's frustration that she had been the only person apprehended. During their conversations, Freeman and Davis also frequently mentioned an individual they called "D," but whom they also referred to on occasion as "Deonte." Armed with this information, in conjunction with her independent research related to the cell phones recovered from Freeman's vehicle, the investigator identified Smarr as a suspect and testified that she was "very confident" that he was a participant in the Anneewakee burglary.

Freeman eventually tired of being the only suspect in jail and agreed to speak to investigators. In her statement, she confessed the details about the Anneewakee burglary and provided the identities of the other individuals involved, including Davis, Smarr, and their co-conspirator, Lindsey Mayes.

With respect to the Anneewakee burglary, Freeman reported that after identifying the target store, she and Davis drove in one vehicle and Smarr and Mayes in another, as they conducted late-night surveillance to ensure that the store was closed and free of potential witnesses. The foursome then met at a separate location and all got into Freeman's car. The crew brought with them a combination sledge hammer/ax tool and a crowbar. They returned to the store at approximately 1:00 a.m., where Davis got out and cut the wires to the store's security system. After ensuring the security system was disabled, the crew left and waited approximately 30 minutes in order to confirm that no one had been alerted to their presence. Upon returning to the store, Smarr and Mayes broke the glass in the door to gain entry and returned shortly thereafter with the store's safe on a hand truck. The deputy drove up as Davis, Smarr, and Mayes were attempting to load the safe onto Freeman's truck and everyone fled the scene, with only Freeman being apprehended.

In addition to detailing the Anneewakee burglary, Freeman confessed that she and her co-conspirators—including Smarr—had been involved in several other burglaries and attempted burglaries. She specifically detailed the attempted burglary of a Shell gas station located on Post Road, which occurred on May 9, the week prior to the Anneewakee burglary (the "attempted Shell burglary").

4

With respect to the attempted Shell burglary, Freeman explained to investigators and testified at trial that, per their usual practice, Davis identified the Shell station as the desired target of their burglary. During the daylight hours on the day of the intended crime, she and Davis "scope[d]" out the store to determine the location of the surveillance cameras and security-alarm wires. Later that night, Freeman drove Davis to meet Smarr and Mayes, who had driven in a separate vehicle to again surveil the Shell station and confirm that there was no sign of unwanted activity. At approximately 1:00 a.m., the four individuals met in a different location and drove to the Shell station together in Freeman's truck. After determining that "everything was clear," Smarr and Mayes disabled the surveillance cameras and cut the security-alarm wires. Having done so, the foursome left and waited approximately 30 minutes to ensure that their actions had not triggered an alert to the police or security company. They then returned to the Shell station, where Smarr and Mayes proceeded to the back of the building and, using a sledge hammer and an ax, broke through the wall of the building. Before the pair was able to enter the store, however, they heard an alarm that had been triggered on the interior of the building. Having communicated this fact via cell phone to Freeman and Davis, who had remained in Freeman's truck, the group agreed to meet in the woods adjoining the gas station.

5

Once reunited in Freeman's truck, the foursome circled the block and noticed that law-enforcement vehicles had arrived on the scene. They thereafter left the area and did not return.

In addition to Freeman's testimony, the jury heard from Mayes. Mayes discussed how he, Smarr, Freeman, and Davis committed the Anneewakee burglary and, with the exception of stating that he and Smarr (as opposed to Davis) disabled the security cameras and alarm, his testimony was entirely consistent with Freeman's. Likewise, his account of the attempted Shell burglary essentially mirrored that of Freeman's, in that he and Smarr disabled the security cameras and alarm and then, after waiting for a period of time, broke a hole in the wall with a sledge hammer prior to hearing an internal alarm that caused the foursome to flee the scene.

The manager of the Shell station also testified and explained that on the night in question, she received a call from the security company alerting her that the store's alarm had been triggered. Upon her arrival at the store, she discovered that the external camera and security system had been damaged, and that a hole had been made in the concrete wall in the back of the building.

Finally, the jury was presented with similar-transaction evidence involving Smarr, which consisted of two other convenience-store burglaries—one in Clayton

County and one in Haralson County—that he participated in with Freeman and Davis. Smarr was caught and arrested at the scene of the Clayton County burglary, and he confessed to participating in the Haralson County crime.

The jury ultimately convicted Smarr of the Anneewakee Road burglary and of criminal attempt to commit burglary of the Shell station. He thereafter moved for a new trial, which the trial court denied. This appeal follows.

1. Smarr argues that the trial court erred in admitting the similar-transaction evidence because the crimes were not sufficiently similar. We disagree.

When considering the admissibility of similar-transaction evidence, the proper focus is "on the similarities, not the differences, between the separate crime and the crime in question."[2] And here, the similar-transaction evidence offered by the State is strikingly similar to the crimes at issue in the case *sub judice*.

The Clayton County burglary occurred in December 2008 and involved Curly's outlet store. Freeman testified that she, Smarr, Davis, and another individual went to the target location during the early morning hours, where Davis cut the wires to disable the store's security equipment and then returned to her truck. She and Davis

---

[2] *Muhammad v. State*, 290 Ga. 880, 882-83 (2) (725 SE2d 302) (2012) (punctuation omitted); *see also Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

proceeded to wait in the truck while Smarr used a sledge hammer/ax combination tool to break a hole in the wall, through which Smarr and the fourth individual could enter the store to retrieve the store's safe, lottery tickets, and cigarettes. At some point, however, a police car pulled up behind the store and, although Freeman and Davis drove from the scene undetected, Smarr and his co-conspirator were arrested on the spot. Smarr had in his possession the sledge hammer/ax combination tool.

The Haralson County crime occurred in April 2009 and involved a different convenience store. As in the other burglaries, Freeman and Davis drove independently of Smarr and a fourth individual and then met at a nearby location, where all four got into Freeman's truck. They then surveiled the area and, after determining the coast was clear, either Smarr or Davis disabled the cameras and security system.[3] Upon leaving and ensuring that law enforcement had not been alerted, Smarr and the fourth individual returned and gained access to the store by jarring the front door. They took with them the sledge hammer/ax combination tool and a crowbar. Although they could not find a store safe, the pair used the tools to break open several gaming machines and took a large amount of change. They then

---

[3] In his subsequent statement to law-enforcement officers, Smarr testified that it was Davis who cut the wires, although Freeman testified that Davis suffered from an injured hip such that Smarr had done the cutting.

called for Freeman and Davis to pick them up. Smarr later confessed to participating in the crime.

Both of the independent burglaries admitted by the State involved a combination of the same individuals, were committed during the early morning hours at comparable stores, were conducted in a similar manner using the same tools, and occurred within six months of the crimes at issue in this case. These facts rendered it well within the trial court's discretion to admit the prior incidences as similar-transaction evidence to show identity, plan, and course of conduct.[4]

2. Smarr next contends that the trial court erred in denying his motion for directed verdict as to the attempted Shell burglary because the State failed to prove the owner of the Shell station. His argument is based on (a) an alleged fatal variance between the indictment and the evidence presented at trial, and (b) insufficient evidence to support the conviction. We will address each of these claims in turn.

---

[4] *See Henderson v. State*, 300 Ga. App. 478, 480-81 (1) (685 SE2d 454) (2009); *Butler v. State*, 294 Ga. App. 540, 543 (2) (669 SE2d 525) (2008); *King v. State*, 246 Ga. App. 100, 101-02 (2) (539 SE2d 614) (2000).

(a) Smarr first argues that a fatal variance exists between the indictment and the evidence presented at trial. In the indictment, the State charged Smarr with the offense of criminal attempt to commit burglary[5] in that,

> on or about May 9, 2009, without authority and with the intent to commit a theft therein, [he] perform[ed] an act which constitutes a substantial step towards burglary, to wit: [he] did cut the telephone and alarm wires and hammer a hole in the wall of the Shell Station located at 3300 Post Road . . . , a building owned by Sandbar Properties . . . .

Smarr contends that the evidence did not show that the Shell station in question was owned by Sandbar Properties, and that the failure to prove this allegation constitutes a fatal variance. Once again, we disagree.

It is well established that under Georgia law, we no longer adhere to an overly technical application of the fatal-variance rule, "focusing instead on materiality."[6]

---

[5] *See* OCGA § 16-4-1 ("A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime."); OCGA § 16-7-1 (a) ("A person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within . . . any building . . . ."); *see also* OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.").

[6] *Weeks v. State*, 274 Ga. App. 122, 125 (1) (616 SE2d 852) (2005) (punctuation omitted).

10

Thus, the threshold inquiry is not whether there "has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused."[7] We make this determination by exploring whether the underlying reasons for the fatal-variance rule have been served, namely (1) whether the allegations definitely inform the accused as to the charges against him so that he may present his defense and not to be taken by surprise, and (2) whether the allegations adequately protect the accused against another prosecution for the same offense.[8] Only if the allegations fail to satisfy either of these two tests is the variance considered "fatal."[9]

In the context of a charge of burglary or criminal attempt thereof, we have previously held that the State's failure to prove ownership of a burglarized dwelling house or building—even if such ownership has been alleged—does not render the variance fatal, so long as the evidence otherwise establishes that the dwelling house

---

[7] *Id.*

[8] *See id.*

[9] *See id.*

11

or building did not belong to the defendant and his entry lacked authority.[10] Indeed, "[o]wnership is not an essential element" to proving the crime of burglary.[11]

Here, the indictment definitely informed Smarr of the crime with which he was being charged and sufficiently identified—by both physical address and corporate name—the building that Smarr was alleged to have attempted to enter without authority. Furthermore, nothing in the indictment was misleading or would have otherwise impeded Smarr's ability to present a defense or taken him by surprise at trial. And finally, Smarr cannot be subjected to a subsequent prosecution for the same crime of the subject Shell station on the date in question. It follows then, that any

---

[10] *See Ward v. State*, 304 Ga. App. 517, 524 (3) (696 SE2d 471) (2010) (affirming defendant's burglary conviction despite that the evidence failed to establish that the burglarized residence was the dwelling house of the named victim, as alleged in the indictment); *Edward v. State*, 261 Ga. App. 57, 59 (2) (581 SE2d 691) (2003) (affirming defendant's burglary conviction regardless of whether actual ownership of the house was as alleged in the indictment). *Cf. Weeks*, 274 Ga. App. at 124-25 (1) (rejecting appellant's argument that evidence that he burglarized a building rather than a dwelling house as charged in the indictment amounted to a fatal variance).

[11] *Murphy v. State*, 238 Ga. 725, 728-29 (2) (234 SE2d 911) (1977) ("'Ownership' . . . is not an essential ingredient . . . within the meaning of our burglary law . . . . All that the law require[s] [is] that the indictment should identify the [building] broken and entered with burglarious intent, and that it should show that it was not the [building] of the party so breaking and entering, but that it was occupied by the prosecutor." (punctuation omitted)); *accord Phillips v. State*, 152 Ga. App. 671, 672 (1) (263 SE2d 480) (1979).

12

variance between the allegations of ownership in the indictment and the evidence at trial was not fatal.[12]

(b) In a related argument, Smarr asserts that the State's failure to prove who owned the Shell station rendered insufficient the evidence that his attempted entry into the building lacked authority. Smarr's argument lacks merit.

The evidence showed that Smarr and his co-conspirators spent the daylight hours "scoping" out the building in question in order to familiarize themselves with its surveillance and security equipment, returned in the early morning hours after confirming that the building was unoccupied, disabled the security cameras and alarm system, took care to ensure that their activity to that point had gone undetected, and then hammered a hole in the wall to gain entry, only to flee upon hearing an alarm and realizing that law enforcement had been alerted. Clearly this evidence was sufficient to allow the jury to infer that Smarr and his co-conspirators' attempted

---

[12] *See Ward*, 304 Ga. App. at 524 (3); *Edward*, 261 Ga. App. at 59 (2); *see also Weeks*, 274 Ga. App. at 124-25 (1).

entry into the Shell station lacked authority.[13] Accordingly, we affirm the trial court's denial of Smarr's motion for directed verdict.

3. Smarr asserts that his trial counsel rendered ineffective assistance in several respects. In order to succeed on his claim, Smarr must establish (1) counsel's performance was deficient and (2) that the deficient performance prejudiced his defense such that there is a reasonable probability that the outcome of the trial would have been different.[14] In this context, prejudice is established by "showing that counsels' errors were so serious as to deprive [Smarr] of a fair trial, a trial whose result is reliable."[15] Unless both deficient performance and prejudice are shown,

---

[13] *See Jones v. State*, 258 Ga. 25, 27 (1) (365 SE2d 263) (1988) (authorizing the jury to infer from the evidence that appellant lacked authority to enter the victim's home even in the absence of direct evidence on that issue); *Ursulita v. State*, 307 Ga. App. 735, 737 (1) (706 SE2d 123) (2011) ("Circumstantial evidence can suffice to prove lack of authority for purposes of the burglary statute."); *see also Reese v. State*, 308 Ga. App. 125, 126 (706 SE2d 623) (2011) (holding evidence sufficient to entitle a jury to infer that appellant, either directly or as a party to the crime, entered the storage garage without authority and with the intent to commit a theft); *Williams v. State*, 268 Ga. App. 384, 387 (1) (b) (601 SE2d 833) (2004) (holding that appellant's forced entry into the victim's residence authorized the jury to infer that he was without authority to be in the home).

[14] *Henderson*, 300 Ga. App. at 482 (3) (punctuation omitted); *see Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984).

[15] *Strickland*, 466 U.S. at 687 (III); *see Angulo v. State*, 314 Ga. App. 669, 672 (3) (725 SE2d 802) (2012).

Smarr has not met his burden of proving a breakdown in the adversary process and is not entitled to a new trial.[16] Mindful of this framework, we turn to Smarr's specific claims of ineffective assistance.

(a) Smarr argues that his counsel was ineffective because counsel failed to prohibit him from being interviewed about the Haralson County burglary that ultimately resulted in his confession to that crime and its admission as similar-transaction evidence in the instant case. At the time Smarr gave his confession, he had not been charged in the Haralson County burglary and his trial counsel did not represent him in relation to that incident.[17] Nonetheless, prior to interviewing Smarr, the investigating officer called Smarr's trial counsel and a conversation then ensued between Smarr and his attorney. Smarr's trial counsel testified at the new-trial hearing that during that conversation, he asked Smarr if Smarr really wanted to speak with the officer, and Smarr responded in the affirmative. Counsel nevertheless testified that he regretted not directing the officer to return Smarr to his cell and not to engage Smarr in any further conversation.

---

[16] *Id.*

[17] As of the date of trial, Smarr had not been charged with a crime in the Haralson County case.

15

Smarr argues that his counsel was deficient in failing to warn him that any statement made in the Haralson County incident could be used against him in the instant case. But Smarr has failed to meet his burden of proving that allegation by the record. Although it is clear from the testimony presented at the motion-for-new-trial hearing that Smarr consulted with his counsel prior to making the statement, the contents of that discussion—besides Smarr's assertion that he desired to speak—are unclear. Moreover, prior to admitting the statement, the trial court conducted a *Jackson-Denno*[18] hearing and determined that Smarr's statement was made voluntarily after having been advised of and waiving his Miranda rights. Thus, the trial court did not err in concluding that Smarr failed to establish that his counsel's performance was deficient in this regard.[19]

---

[18] *See Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LEd2d 908) (1964).

[19] *See Watkins v. State*, 289 Ga. 359, 362 (3) (a) (711 SE2d 655) (2011) (noting that an appellant "may not rely on hearsay or speculation" to demonstrate ineffective assistance); *Sheppard v. State*, 284 Ga. 775, 778 (2) (671 SE2d 830) (2009) (concluding that appellant failed to prove deficient performance by his trial counsel because he did not resolve a discrepancy in the evidence related to his allegation of error); *Gant v. State*, 313 Ga. App. 329, 332 (1) (b) (721 SE2d 913) (2011) (holding that appellant's claim of ineffective assistance failed because he did not support his allegations with record evidence).

(b) Smarr next argues that his trial counsel was ineffective because he failed to properly impeach the testimony of both Freeman and Mayes. Significantly, as a general rule, "matters of reasonable trial strategy and tactics do not amount to ineffective assistance of counsel."[20] And a court deciding an actual ineffectiveness claim must judge the "reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[21]

As to Freeman, Smarr argues that his counsel should have impeached Freeman's testimony by focusing on inconsistencies between her statement to investigators and her trial testimony regarding whether she was an actual participant in the attempted Post Road burglary or whether she learned of the event through Davis. Smarr's counsel testified at the new-trial hearing that he considered Freeman a "terrible witness" for Smarr. He declined to take an aggressive role in cross-examining Freeman because he viewed her as a "very sympathetic" witness (her child

---

[20] *Harris v. State*, 291 Ga. 175, 177 (2) (a) (728 SE2d 178) (2012) (punctuation omitted).

[21] *Angulo*, 314 Ga. App. at 672 (3) (punctuation omitted).

17

had been taken from her as a result of her arrest), and he deduced that trying to "break her down" or portray her as a "low-life liar" would be adverse to Smarr's cause and potentially "irritate" the jury. His strategy was driven by his belief that "the less time she spent [on the witness stand], the better."

As to Mayes, Smarr argues that trial counsel was deficient because counsel failed to effectively impeach Mayes concerning the full magnitude of his extensive prior criminal history and his incentives to fabricate evidence, and in not adequately highlighting inconsistencies in his testimony. Smarr's counsel testified that Mayes was someone "who ha[d] done nothing but steal all his life," and counsel decided not to focus on Mayes's criminal history after concluding that Smarr would not benefit from the jury knowing that Smarr was friends and associated with such a person. Counsel further explained that Mayes, who testified while wearing a jail jumpsuit, freely admitted on the stand that he was a recidivist currently in jail, who became eligible for parole in exchange for agreeing to testify against Smarr. And finally, the inconsistencies about which Smarr complains (namely, who disabled the security cameras and alarm during the Anneewakee burglary) were discussed while Mayes underwent questioning from the other attorneys involved in the case.

18

Smarr has failed to show that his counsel's strategy and tactics with respect to his cross-examination of Freeman or Mayes were unreasonable.[22] The trial court, therefore, did not err in denying Smarr's motion for new trial on this ground.

(c) Smarr contends that his trial counsel was ineffective in not seeking suppression of his cellular-telephone records and cell-site-tower-location information ("CSLI"), which he argues was obtained without statutory authority and in violation of his Fourth Amendment rights against unreasonable searches and seizures. The challenged information was obtained pursuant to a court order authorizing the service of a subpoena upon the network provider servicing one of the cellular phones

---

[22] *See Chance v. State*, Case No. S12A0684, 2012 WL 2218738, at *6 (7) (b) (Ga., June 18, 2012) ("Decisions about what questions to ask on cross-examination are quintessential trial strategy . . . and will rarely constitute ineffective assistance of counsel." (citation and punctuation omitted)); *Sims v. State*, Case No. A12A1142, 2012 WL 3290017, at *3 (2) (Ga. App., Aug. 14, 2012) ("Trial tactics and strategy, however mistaken they may appear with hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (punctuation omitted)); *Watts v. State*, 304 Ga. App. 632, 635 (697 SE2d 272) (2010) (holding that counsel's failure to impeach the victim's credibility with various instances of fraud did not amount to ineffective assistance because, *inter alia*, "the degree to which an attorney chooses to cross-examine witnesses and the manner in which to attack their credibility fall within the ambit of trial tactics" (punctuation omitted)).

recovered from Freeman's vehicle following her arrest.[23] It provided additional evidence that the cellular phone belonged to Smarr, and that on the date and time of the Anneewakee burglary, the telephone was being used in the vicinity of the burglarized convenience store and had been exchanging telephone calls with both Freeman and Davis.

In its order denying Smarr's motion for new trial, the trial court held that his counsel was not ineffective in failing to move to suppress the information because the motion would not have been successful based upon the law as it existed at the time of the trial.[24] And while we recognize that, due to the advanced nature of the

---

[23] Smarr also asserts that the information was improperly obtained without having provided the cellular-service provider with a copy of the court order authorizing the requested information. Smarr's argument is belied by the record, however, which contains evidence of the subpoena directed to the cellular provider, the court order authorizing the subpoena, and documentary evidence that the cellular provider was presented with both.

[24] *See* 18 U.S.C. § 2703 (c) (1) (B) ("A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity. obtains a court order for such disclosure . . . ."); OCGA § 16-11-66.1 (a) ("A law enforcement officer, a prosecuting attorney, or the Attorney General may require the disclosure of stored wire or electronic communications, as well as transactional records pertaining thereto, to the extent and under the procedures and conditions provided for by the laws of the United States."); *In re Application of the United States,* 620 F3d 304, 307-08 (I), 313 (II) (3d Cir. 2010) (noting that "there is no

20

technology at issue, the law in this area is continuously evolving, Smarr's motion

would be denied based upon the latest authority on the issue as well.[25] Consequently,

Smarr has failed to show that his counsel was deficient in failing to file a motion to

suppress, and further failed to meet his burden of proving that there is a reasonable

dispute that historical CSLI is a 'record or other information pertaining to a subscriber . . . or customer,' and therefore falls within the scope of § 2703 (c) (1)," and "CSLI from cell phone calls is obtainable under a § 2703(d) order [which] does not require the traditional probable cause determination"); *United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *4 (I) (B) (5) (N.D. Ga., Sept. 27, 2007) ("Using cell site data to obtain a rough area of location for a target telephone is not a constitutional violation unless the information obtained pinpoints the target phone's location to a place where the subject has a legitimate expectation of privacy," which does not include public streets.).

[25] *See United States v. Skinner*, No. 09-6497, 2012 WL 3289801, at *5 (II) (A) (6th Cir., Aug. 14, 2012) ("Because . . . cell-site data is simply a proxy for the defendant's visually observable location, and a defendant has no legitimate expectation of privacy in his movements along public highways, . . . the DEA agents did not conduct a search within the meaning of the Fourth Amendment." (punctuation omitted); *Tracey v. State*, 69 So3d 992, 995-96 (D. Fla. 2011) (recognizing that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another" and, thus, "no Fourth Amendment violation occurred" when CSLI was obtained to monitor appellant's movement while he was on public roads (punctuation omitted)); *see also United States v. Karo*, 468 U.S. 705, 711-13 (2) (104 SCt 3296, 82 LEd2d 530 (1984); *United States v. Knotts*, 460 U.S. 276, 281-85 (II) (103 SCt 1081, 75 LEd2d 55) (1983).

probability that the outcome of the trial would have been different had counsel challenged the subject evidence in the manner asserted by Smarr.[26]

(d) Smarr contends that his trial counsel was ineffective for failing to object to the admission of the Clayton County and Haralson County crimes on the ground that the crimes were not sufficiently similar to the instant crimes to warrant their admission. As we held in Division 1, however, any such objection to the similar-transaction evidence would have been futile and cannot form the basis of a claim for ineffective assistance of counsel.[27]

(e) Lastly, Smarr argues that his counsel rendered ineffective assistance by failing to object to certain testimony by two investigators who actively worked on Smarr's case. The challenged testimony involved statements related to Freeman's confession that she and others—including Smarr—had committed several burglaries in addition to the ones for which Smarr was being tried, and that the investigators had spoken to the owners of some of the stores mentioned by Freeman and confirmed that Freeman's statements were consistent with the respective owners' accounts of what

---

[26] *See Strickland*, 466 U.S. at 687 (III); *Henderson*, 300 Ga. App. at 482 (3).

[27] *See Ventura v. State*, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008) ("The failure to pursue a futile objection does not amount to ineffective assistance."); *see also Edwards v. State*, 282 Ga. 259, 263 (8) (c)) (646 SE2d 663) (2007).

had transpired. Smarr argues, *inter alia*, that the testimony constituted the improper admission of similar-transaction evidence without the requisite pre-trial hearing.[28] Smarr's counsel agreed at the new-trial hearing that the testimony resulted in the improper admission of similar-transaction evidence, but was unable to recall why he failed to object.

We agree with Smarr that the subject testimony was inadmissible and that his counsel was deficient for failing to object to its admission.[29] Nevertheless, Smarr is not entitled to a new trial in the absence of a showing of prejudice, such that a reasonable probability exists that the outcome of the trial would have been different had the evidence not been admitted.[30] This he has failed to do. The jury was presented

---

[28] *See* Uniform Sup. Ct. R. 31.3 (B).

[29] *See Hudson v. State*, 271 Ga. 477, 479 (2) (521 SE2d 810) (1999) ("Generally in a criminal trial, proof that the defendant committed a distinct, independent, and separate offense is highly and inherently prejudicial, irrelevant and inadmissible, even if it is a crime of the same sort for which the defendant is being tried, unless there is some logical connection between the independent act and the crime for which the defendant is being tried, from which it can be said that proof of one tends to establish the other. The prosecutor seeking to introduce a defendant's independent offense must establish in a pre-trial hearing, among other things, the similarity between the independent act and the crime for which the defendant is being tried." (citations omitted)); *see also Williams*, 261 Ga. at 641-42 (2) (b).

[30] *See Henderson*, 300 Ga. App. at 482 (3); *see Strickland*, 466 U.S. at 687 (III).

with the direct testimony of two of Smarr's accomplices, who provided detailed accounts of Smarr's participation of the crimes at issue—the vast majority of which were remarkably consistent with each other, the store owners' descriptions, and the physical evidence at the scene of the crimes—in addition to the cellular evidence placing Smarr around the scene of the crime during the Anneewakee burglary, and the properly admitted similar-transaction evidence involving two other burglaries committed in largely the same manner—one of which resulted in Smarr being caught red-handed and the other of which he admitted to committing. Under these circumstances, the trial court did not err in denying Smarr's claim of ineffective assistance of trial counsel.[31]

4. Finally, Smarr argues that the trial court erred by enhancing the custodial terms of his sentence after he had begun serving the same. We agree.

The trial court's original order sentenced Smarr to a thirty-year sentence—ten years to be served in incarceration and the remaining twenty years to be served on

---

[31] *See Bright v. State*, 314 Ga. App. 589, 595 (3) (725 SE2d 327) (2012) (appellant failed to establish prejudice related to any error in counsel's failure to object to the admission of similar-transaction evidence in light of the strong evidence of his guilt); *see also Ellis v. State*, Case No. A12A0232, 2012 WL 2369302, at *10 (8) (c) (Ga. App., June 25, 2012) (same); *Moore v. State*, 301 Ga. App. 220, 225 (3) (687 SE2d 259) (2009) (same).

probation—and on its face indicated that Smarr was being sentenced "as a repeat[ ] offender under OCGA § 17-10-7 (c)."[32] Smarr subsequently filed a motion for correction of sentence in which he requested that the trial court omit the reference to OCGA § 17-10-7 (c) on the basis that, at the time that Smarr had committed the acts at issue in this case, he was not a fourth offender, but had at most two prior felony convictions.[33] At the hearing on Smarr's motion, counsel emphasized that he was "not seeking anything regarding the equities of the sentence" or "seeking any other sentence modification" at that time, but requesting only that the trial court remove the reference to OCGA § 17-10-7 (c). The trial court then issued a new sentencing order

---

[32] OCGA § 17-10-7 (c) provides as follows:

[A]ny person who, after having been convicted under the laws of this state for three felonies or having been convicted under the laws of any other state or of the United States of three crimes which if committed within this state would be felonies, commits a felony within this state shall, upon conviction for such fourth offense or for subsequent offenses, serve the maximum time provided in the sentence of the judge based upon such conviction and shall not be eligible for parole until the maximum sentence has been served.

[33] *See Dobbs v. State*, 180 Ga. App. 714, 715 (2) (350 SE2d 469) (1986) (holding that the convictions warranting the application of OCGA § 17-10-7 (c) must have occurred before the acts upon which the recidivist sentence is imposed).

25

deleting the reference to OCGA § 17-10-7 (c) but, in so doing, increased the incarceration component of Smarr's sentence from ten years to fifteen years, such that his new sentence was thirty years, fifteen years to serve in incarceration and the remaining fifteen years to be served on probation.[34]

It is undisputed that at the time the trial court issued the modified order, Smarr had already begun serving his incarcerated sentence. And our Supreme Court has made it abundantly clear that once a defendant begins serving his sentence, "that sentence can only be increased through resentencing where (a) such resentencing is allowed by law, and (b) the defendant has no reasonable expectation in the finality of the original sentence."[35] In the absence of such circumstances, the "limitation on the court's sentencing authority stems from the double jeopardy provisions of our constitutions."[36]

---

[34] In between the original sentencing order and the final sentencing order, the trial court issued an order in which it sentenced Smarr to a total of thirty-five years—fifteen years in incarceration and twenty years on probation.

[35] *Williams v. State*, 273 Ga. App. 42, 46 (6) (614 SE2d 146) (2005) (punctuation omitted); *see Wilford v. State*, 278 Ga. 718, 720 (606 SE2d 252) (2004).

[36] *Curry v. State*, 248 Ga. 183, 185 (4) (281 SE2d 604) (1981); *see United States v. Benz*, 282 U.S. 304 (51 SCt 113, 75 LEd 354) (1931).

Nothing in the burglary statute authorizes the manner of resentencing imposed by the trial court in this case.[37] And we reject the State's contention that by requesting that the trial court omit the improper reference to OCGA § 17-10-7 (c) on the face of the sentencing order, "he was seeking modification of his sentence . . . [and] cannot claim that he had a reasonable expectation that his sentence was final." This is particularly true when counsel emphasized on more than one occasion during the hearing on his motion that Smarr was neither challenging the equity of nor seeking any modification of the sentence itself. Under these circumstances, we are constrained to vacate the order imposing the increased sentence and remand this case to the trial court for resentencing in accordance with this opinion.[38]

---

[37] *See* OCGA § 16-7-1. *Compare* OCGA § 42-8-60 (b) ("[U]pon the court determining that the defendant is or was not eligible for sentencing [as a first offender], the court may enter an adjudication of guilt and proceed as otherwise provided by law."); *Wilford*, 278 Ga. at 720 (holding that a defendant "who knowingly provides false information to the trial court in order to receive first offender treatment has no reasonable expectation that the resulting sentence is final" and may be subject to an enhanced sentence (punctuation omitted)).

[38] *See Stulb v. State*, 279 Ga. App. 547, 550-52 (2) (631 SE2d 765) (2006) (holding that order modifying appellant's ten year sentence from one year to serve and nine years on probation to four years to serve and six years on probation was void after appellant had already begun serving sentence); *Williams*, 273 Ga. App. at 47 (6) (holding the trial court's enhanced sentence was unauthorized and remanding the case to the trial court for resentencing).

*Judgment affirmed in part, vacated in part, and case remanded. Ellington, C. J., and Phipps, P. J., concur.*