310 Ga. 770
FINAL COPY

S20A1101. LOFTON v. THE STATE.

ELLINGTON, Justice.

A jury found Hakim Lofton guilty of malice murder and possession of a firearm in connection with the shooting death of Jason Walker.[1] On appeal, Lofton challenges the sufficiency of the evidence and contends that the trial court erred in admitting cell-site location information that was obtained without a warrant, in

---

[1] The shooting occurred on October 10, 2013. A Fulton County grand jury returned an indictment on January 14, 2014, charging Lofton with malice murder (Count 1), felony murder predicated on armed robbery (Count 2), felony murder predicated on aggravated assault (Count 3), armed robbery (Count 4), aggravated assault (Count 5), and possession of a firearm during the commission of a felony (Count 6) predicated on Counts 1 through 5. At a jury trial commencing on September 22, 2014, Lofton was found not guilty on Counts 2 and 4 and guilty on the remaining counts. By judgment entered on September 30, 2014, the trial court sentenced Lofton to life in prison for murder (Count 1) and five years in prison for the firearm charge (Count 6) to run consecutively. Count 5 merged with Count 1. The judgment indicated that Count 3 also merged with Count 1, although it was actually vacated by operation of law. See *Bradley v. State*, 305 Ga. 857, 858 n.1 (828 SE2d 322) (2019). Lofton filed a timely motion for a new trial, which he amended on June 6, 2016, and April 22, 2019. After a hearing, the trial court denied the motion for a new trial on August 4, 2019. Lofton filed a timely notice of appeal, and his appeal was docketed in this Court to the August 2020 term and submitted for a decision on the briefs.

failing to instruct the jury regarding the corroboration required for accomplice testimony, in allowing certain exhibits to go out with the jury, and in rejecting his claim that there was racial discrimination in jury selection. Lofton also contends that he received ineffective assistance of counsel. For the reasons explained below, we affirm.

1. Lofton contends that the evidence that he was the person who shot Walker was entirely circumstantial and that it was insufficient to prove identity beyond a reasonable doubt. Specifically, he argues that the only eyewitness to the shooting, Joseph Eatmon, lacked credibility and, at any rate, was unable to positively identify him as the shooter. The rest of the State's evidence, Lofton argues, can only prove that he was associated with Eatmon and Walker and that he was in the area of the crimes when they happened.

> When reviewing the sufficiency of the evidence as a matter of constitutional due process, we view the evidence in the light most favorable to the verdicts, see *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), and do not resolve conflicts in the evidence, leaving those within the province of the jury. In addition, as a matter of Georgia statutory law, where a conviction

2

is based on circumstantial evidence, . . . the evidence must "not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether an alternative hypothesis is reasonable or whether the circumstantial evidence excludes every reasonable hypothesis save that of guilt is left to the jury, and this Court will not disturb that finding unless it is insupportable as a matter of law.

*Schell v. State*, 310 Ga. ___, ___ (___ SE2d ___) (2020) (citations and punctuation omitted).

Viewed in this manner, the evidence shows the following. In 2013, Walker frequently asked his friend, Eatmon, to connect him with someone who would sell him Xanax tablets, and Eatmon brokered transactions for Walker approximately 25 to 30 times. On October 8, 2013, Eatmon brokered such a transaction with Cedric Brown. Walker and Eatmon met Brown at a QuikTrip station on Upper Riverdale Road, where Walker bought approximately 30 tablets of Xanax that had been prescribed to Brown's girlfriend's mother.

The next day, October 9, Walker wanted to buy a much larger quantity of Xanax. Eatmon called Brown, and Brown said that he

might know someone who could fill the order. Brown called Lofton, whom he knew as Lil Tony and who lived in the same area of Riverdale as Brown. Brown told Lofton about Eatmon's request and asked if he could give Eatmon Lofton's number. Lofton agreed, and, after Brown gave Eatmon the number, Brown had no more involvement in that sale. Eatmon called Lofton that evening and set up a meeting for the transaction the following day.

Eatmon and Lofton agreed to meet at the College Park transit station between 7:00 and 8:00 a.m. on October 10. Walker picked up Eatmon in his white Honda between 7:30 and 7:45 a.m. Lofton called Eatmon while Eatmon and Walker were en route to the College Park station, said he was running late, and changed the meeting place to a bus stop on Washington Road near Camp Creek Parkway. Eatmon told Lofton they were near that intersection and would pull into the Chevron station near the bus stop.

The bus arrived a few minutes later, and a solitary passenger got off. Based on their recent phone calls, Eatmon deduced that the passenger was Lil Tony and waved him over to Walker's car. Lil

4

Tony got into the back seat behind Eatmon and told Walker to continue on Washington Road to an apartment complex off of Spanish Trail. Walker stopped at a Chevron station near the apartments, and Eatmon got out and went into the convenience store. When Eatmon came out of the store, he saw that Walker had parked at the apartments, and Eatmon followed on foot. As Eatmon approached Walker's car, he saw Lil Tony exit the car on the passenger side, pull a gun out of his jacket, shoot into the car, and then run away. When Eatmon reached the car, Walker told Eatmon that he had been shot and asked Eatmon to take him to the hospital. Walker moved into the passenger seat, Eatmon got into the driver's seat, and Eatmon called 911 as he drove to South Fulton Hospital. During the drive, Walker asked Eatmon not to tell anyone about the drug deal, because he did not want his family to know about his continuing drug addiction.

When Eatmon and Walker reached the hospital, they were met by East Point police officers. Walker was taken inside for treatment, and Eatmon spoke briefly with two East Point police department

detectives at the hospital and then went with them to the police station for questioning. Eatmon told the detectives that he had been taking Walker to see a prostitute at a motel and that Walker was shot in a robbery at the Chevron station on Washington Road near Camp Creek Parkway. Eatmon signed a written summary of his statement.

Walker died at the hospital at about 5:00 p.m. on the day he was shot. After learning that Walker did not survive, Eatmon told the detectives that the parts of his previous oral and written statements about the prostitute and about Walker being shot in a robbery had been lies, which he told because Walker had asked him to conceal his drug habit from his family. Eatmon said that he and Walker had actually met a drug dealer so Walker could purchase Xanax, and that the dealer shot Walker. Eatmon gave the actual location for the shooting. He told the detectives that the only name he had for the dealer was "Lil Tony" and gave them the phone number he had used to communicate with Lil Tony. Eatmon also informed them that he was introduced to Lil Tony through Brown,

6

and he gave the detectives Brown's phone number.

That day, the detectives interviewed Brown at his home in Riverdale, and he told them about giving Lil Tony's phone number to Eatmon for the drug deal, which was the same phone number Eatmon used to contact Lil Tony. Brown told the detectives that Lil Tony lived near him, on Ridge Trail, in a house he described. Based on the information that Brown gave, the detectives were able to determine Lil Tony's address on Ridge Trail. Because that address was in Clayton County, the detectives contacted the Clayton County police department for information about the residents. The detectives learned the legal name of Lil Tony, and the Clayton County police provided a booking photo of Lofton.

The detectives prepared a photo lineup that included Lofton's booking photo, and they showed it to Brown on October 14. He immediately and positively identified Lofton as the person he knew as Lil Tony. The detectives also showed Eatmon a photo lineup, and Eatmon picked Lofton's picture, although his identification was uncertain. The next day, the detective applied for a warrant to arrest

Lofton for Walker's murder. Lofton was arrested by United States marshals at his home on October 16. That same day, the detectives and other officers executed a search warrant for Lofton's home. They found more than seventy .22-caliber long rifle hollow-point rounds and three .22-caliber shell casings in Lofton's bedroom, which was the same type of bullet that killed Walker and was removed from his body during his autopsy. No firearm was found in Lofton's home.

At trial, Brown identified Lofton as the drug dealer whom he knew as Lil Tony and whose phone number he gave to Eatmon for the drug deal. Eatmon could not specifically identify Lofton as the drug dealer Lil Tony whom he met minutes before he saw the dealer shoot Walker, but he described Lil Tony as a black male, in his early 20s, 5′ 8″ to 5′ 9″ tall, who was wearing a black jacket, blue jeans, and a hoodie, with the hood pulled up when Eatmon met him. Eatmon testified that he had just "glanced at [Lil Tony's] face" when he and Walker picked him up at the Chevron station on the day of the shooting. He testified that during the photo lineup he chose the photo of the one who looked "similar" to Lil Tony.

The State introduced MetroPCS records, including subscriber information and call logs that included cell-site location information, for cell phones used by Eatmon, Brown, and Lofton. The phone records, together with the testimony of a records custodian who was qualified as an expert in MetroPCS's recordkeeping practices, showed that Eatmon's and Brown's phones exchanged calls on October 8 and 9, and that, at the same time on October 8, both of their phones connected to a cell tower near the QuikTrip station on Upper Riverdale Road where they met for the drug deal that day. The phone records also showed that, after Eatmon's phone called Brown's phone on October 9, Brown's phone called Lofton's phone, then Brown's phone called Eatmon's phone, then Eatmon's phone called Lofton's phone. Lofton's phone exchanged calls with Eatmon's phone and with Brown's phone additional times that night. The phone records showed that on October 10, the day of the shooting, Lofton's phone called Eatmon's phone at 7:11 a.m., and they exchanged calls an additional eight times over the next ninety minutes; cell-site location information showed that Lofton's phone

was on the move during that interval. At the time of their last call, 8:40 a.m., Lofton's phone called Eatmon's phone, and the call lasted less than one minute; both Lofton's phone and Eatmon's phone connected to Sector 3 of Tower 109, located at 3485 Desert Drive in East Point, which is near the Chevron station where Walker and Eatmon picked up Lofton. At 8:49 a.m., Lofton's phone connected to Sector 2 of Tower 422, located at 4399 S. Commerce Drive in East Point, which was the nearest cell site to where Walker was fatally shot. Two minutes later, at 8:51 a.m., Eatmon's phone called 911. The nearest cell site at the beginning of the call was also Sector 2 of Tower 422. By the end of the 911 call, Eatmon, while driving Walker to the hospital, was back in range of Sector 3 of Tower 109.

Assuming without deciding that the evidence of Lofton's guilt was entirely circumstantial, the State presented sufficient evidence to support the convictions, despite the inability of the only eyewitness to the shooting, Eatmon, to positively identify him and

despite any purported deficits in Eatmon's credibility.[2] Brown positively identified Lofton as the drug dealer he knew as Lil Tony; his information led detectives to Lofton's residence; and Brown's testimony connected Lofton to Eatmon and to the October 10 planned drug deal involving Walker. Phone records for Lofton, Eatmon, and Brown supported the testimony of Eatmon and Brown about the communications among them on the day of the shooting and the days before and after. And the MetroPCS records placed Lofton's phone at the location of the shooting at the time of the shooting. Thus, the evidence presented at trial was both sufficient to allow a rational jury to find beyond a reasonable doubt that Lofton was guilty of the crimes for which he was convicted, as required by due process, and to reject any hypothesis save that of his guilt for

---

[2] At trial, Lofton argued during closing argument that Eatmon was not credible, based on several factors: Eatmon was a convicted felon; he lied during the trial about his criminal past; he admitted that he initially lied to the detectives about details of the incident; the security video from the first Chevron station did not confirm his testimony (because it did not show a white Honda in the parking lot on the morning of October 10); and no forensic evidence confirmed his testimony about the location of the shooting. Lofton also argued that the investigation was flawed in that the detectives did not treat Eatmon, Brown, or others as potential suspects.

those crimes, as required by OCGA § 24-14-6. See *Payne v. State*, 273 Ga. 317, 318 (1) (540 SE2d 191) (2001) (evidence sufficient to authorize rational trier of fact to find accused guilty beyond a reasonable doubt of murder and possession of a knife and to exclude every reasonable inference and hypothesis except guilt of accused, despite lack of any eyewitness testimony that defendant stabbed victim or that he possessed a knife).

2. Lofton contends that the trial court erred in denying his motion to suppress his cell phone records and all of the evidence derived from those phone records. At the hearing on Lofton's motion to suppress, one of the East Point detectives who investigated the shooting testified as follows. About 12 hours after the shooting, she spoke with a MetroPCS representative and told the representative that there had been a murder that morning, that the detective had a phone number for the suspect (the number Eatmon and Brown used to contact the drug dealer they knew as Lil Tony), and that she needed information from the suspect's account. The detective explained that there was a witness who was known to the suspect

12

and could be harmed while the suspect was still at large. The MetroPCS representative e-mailed an "Exigent Circumstance Request" form for the detective to complete. On the request form, the detective requested subscriber data for the target phone number and asked for call-detail records, including cell sites,[3] for the day of the shooting and the three previous days. The detective described the "nature of the emergency" by stating that a murder victim "had contact with his murderer through the target number." The form included the statement, "I hereby attest that the information provided above, to the best of my knowledge, is true and accurate and that . . . an emergency situation exists that involves . . .

---

[3] A "cell site" typically consists of a set of either three or six directional radio antennas mounted on a tower, light post, flagpole, church steeple, or side of a building. See *Carpenter v. United States*, 585 U. S. __, __ (I) (A) (138 SCt 2206, 2211, 201 LE2d 507) (2018). Unless powered off, a cell phone continuously scans its environment looking for the strongest signal, which generally comes from the nearest cell site. See id. Each time a phone connects to a cell site, the connection generates a time-stamped digital record in the service provider's account records that includes the particular cell site and the specific antenna activated ("sector" information); such records are known as cell-site location information. See id. Service providers generally maintain account-specific data, including cell-site location information, for long periods of time. See id. at __ (III) (A) (138 SCt at 2218) (wireless carriers "currently maintain records for up to five years").

13

immediate danger of death or serious bodily injury to a person[.]"

First, Lofton argues that the detective's initial, warrantless acquisition of his cell phone records on the day of the shooting, including four days of historical cell-site location information ("CSLI"), was a search under the Fourth Amendment, because a cell phone user has a reasonable expectation of privacy in historical CSLI for his phone. Second, Lofton argues that the trial court erred in finding that the warrantless search of his cell phone records was justified by exigent circumstances, because the detective had no case-specific information that the then-unidentified shooter was fleeing, had threatened to harm any person, or was actively destroying evidence. Lofton argues that the exclusionary rule therefore requires suppression of the initial tranche of his cell phone records as well as suppression of all the evidence derived from those records as "fruit of the poisonous tree."[4] Putting aside the first and

---

[4] In the affidavit supporting the application for an arrest warrant, the detective stated that Lofton's phone records showed contact with Eatmon before the shooting and that cell tower sites indicated that Lofton's phone was in the area at the time of the shooting. She also summarized the witnesses'

second elements of Lofton's argument, we conclude that the exclusionary rule does not apply to the evidence at issue. Therefore, reversal is not required.

At the time of Lofton's trial in 2014, no appellate precedent binding in Georgia courts held that a request or demand by a governmental entity to a cell phone service provider that the provider produce its records related to a customer's account constituted a search under the Fourth Amendment.[5] Under then-

_____

statements that Brown referred Eatmon to Lofton as a source for the drugs Walker wanted to buy and stated that Brown positively identified Lofton in a photo lineup as the person he had referred Eatmon to for the drug deal. After Lofton was arrested, the detective used the same information in an affidavit supporting her application for a warrant to search Lofton's home. And, weeks later, she used the same information in affidavits for search warrants for MetroPCS records, including the content of text messages, for Lofton's, Eatmon's, and Brown's phones for October 1 through 20, 2013.

[5] See *Reed v. State*, 307 Ga. 527, 535 (2) (b) (837 SE2d 272) (2019) (Trial counsel was not ineffective in failing to seek to suppress the defendant's cell phone records that included CSLI, which were obtained pursuant to a court order, because at the time of defendant's 2017 trial, "Georgia appellate precedent held that a search warrant was not required to obtain CSLI." (citation omitted)); *Smarr v. State*, 317 Ga. App. 584, 593 (3) (c) (732 SE2d 110) (2012) (Trial counsel was not ineffective in failing to seek to suppress the defendant's cell phone records that included CSLI, which were obtained pursuant to a court order, on the basis that the records were obtained without statutory authority and in violation of the defendant's Fourth Amendment rights against unreasonable searches and seizures, because a motion to suppress "would not have been successful based upon the law as it existed at

15

existing constitutional doctrine, a person generally lacked a

reasonable expectation of privacy in business records owned and

maintained by a third-party business.[6] The government's access to

---

the time of the trial" in 2010.).

[6] See *Smith v. Maryland*, 442 U. S. 735, 742-746 (99 SCt 2577, 61 LE2d 220) (1979) (holding that a landline telephone customer has no reasonable expectation of privacy in a record of the outgoing phone numbers dialed on his telephone because he voluntarily conveys such information to the telephone company); *United States v. Miller*, 425 U. S. 435, 442-443 (96 SCt 1619, 48 LE2d 71) (1976) (holding that a bank customer has no reasonable expectation of privacy in records held by the bank, such as canceled checks, deposit slips, and monthly statements, because he voluntarily conveys information about his financial transactions to the bank).

In support of Lofton's motion to suppress, he cited a 2014 Eleventh Circuit panel decision holding that the *Smith* and *Miller* third-party doctrine holdings did *not* extend to historical CSLI obtained with a court order issued under the SCA, 18 USC § 2703 (c) (1) (B), (d); that "cell site location information is within the subscriber's reasonable expectation of privacy"; and that "[t]he obtaining of that data without a warrant is a Fourth Amendment violation." *United States v. Davis*, 754 F3d 1205, 1217 (I) (11th Cir. 2014) (*"Davis I"*). That decision was not binding in Georgia courts. See *State v. Rosenbaum*, 305 Ga. 442, 449-450 (2) (826 SE2d 18) (2019) (Eleventh Circuit decisions are not binding in Georgia courts, although this Court can consider them as persuasive authority.); *Deen v. Stevens*, 287 Ga. 597, 601 (2) (b) (698 SE2d 321) (2010) (Eleventh Circuit decisions are not binding in Georgia courts, even on federal law questions, although this Court can consider them as persuasive authority.). Moreover, before Lofton's trial began, the Eleventh Circuit vacated *Davis I* for rehearing en banc, see *United States v. Davis*, 573 Fed. Appx. 925 (11th Cir. 2014), and later held that the government's obtaining a court order under the SCA for the production of the cell phone provider's business records did not constitute a search and did not violate the subscriber's Fourth Amendment rights. See *United States v. Davis*, 785 F3d 498, 507-513 (III) (11th Cir. 2015).

such records was not unfettered, however, but was governed by federal and state statutes. Title II of the Electronic Communications Privacy Act of 1986, commonly called the Stored Communications Act ("SCA"),[7] provides some privacy protection for the content of electronic communications and for non-content or transactional records maintained by providers of electronic communications services. The SCA protects the privacy of electronic communications under two paths: by limiting providers' ability to voluntarily disclose a user's information, in 18 USC § 2702, and by specifying the circumstances in which the government can compel providers to disclose their users' information, in 18 USC § 2703. See *Alexander v. Verizon Wireless Svcs.*, 875 F3d 243, 250 (III) (5th Cir. 2017); *Registe v. State*, 292 Ga. 154, 155-156 (734 SE2d 19) (2012).[8]

---

[7] Title II is codified at 18 USC §§ 2701 through 2710. We note that the provisions of the SCA discussed herein have not been amended since Lofton's trial.

[8] See *Hampton v. State*, 295 Ga. 665, 671 (763 SE2d 467) (2014) (Nahmias, J., concurring) (noting that, under "*constitutional*" doctrine applicable at the time of a 2012 trial, "the Fourth Amendment's protections do not encompass records of a person's stored communications when the police obtain those records from someone else, like the person's communications provider," although "federal and Georgia *statutory* law imposes limits on the

17

In terms of voluntary disclosures under 18 USC § 2702, the SCA generally prohibits a provider from voluntarily divulging "a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity." 18 USC § 2702 (a) (3).[9] The SCA provides remedies and sanctions for prohibited

---

authority of law enforcement to demand stored wire and electronic communications information from a communications provider" (emphasis in original)).

[9] 18 USC § 2702 (a) provides that, except as otherwise provided:

(1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and

(2) a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service —

> (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service;
> (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing; and

(3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of

18

disclosures.[10] But a service provider can voluntarily provide such non-content records to a governmental entity if the provider has a good faith belief that an emergency poses a risk of death or serious physical injury that requires disclosure without delay. See 18 USC § 2702 (c) (4).[11] MetroPCS therefore violated the SCA by voluntarily

communications covered by paragraph (1) or (2)) to any governmental entity.

[10] See 18 USC §§ 2701 (providing criminal penalties for "intentionally access[ing] without authorization" or "intentionally exceed[ing] an authorization to access" a "facility through which an electronic communication service is provided"); 2707 (a) (providing a civil remedy for any "person aggrieved by any violation of [the SCA] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind"), (d) (providing for administrative discipline of government employees under certain circumstances); 2708 ("The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter.").

[11] 18 USC § 2702 (c) (4) provides:

A provider . . . may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a) (1) or (a) (2)) . . . to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency[.]

See *United States v. Gilliam*, 842 F3d 801, 803 (2d Cir. 2016) (As used in 18 USC § 2702 (c), the phrase "other information" includes the current location of a subscriber's cell phone. A provider was authorized to disclose a subscriber's current location to law enforcement officers under subsection (c) (4) because the officers had received credible information that the subscriber was transporting a missing child in order to require her to work as a prostitute, which was an emergency involving danger of serious physical injury to the

producing the subscriber information and call logs with CSLI requested by the detective, unless it had a good faith belief that a qualifying emergency existed.

Here, when requesting Lofton's records, the detective attested that an emergency existed that involved immediate danger of death or serious bodily injury to a person. She explained that there was a witness who was known to a murder suspect and that the records were needed to apprehend the suspect and to prevent the witness from being harmed. In *Registe*, a factually similar case decided two years before Lofton's trial,[12] this Court determined that a law enforcement request for voluntary disclosure of cell phone records satisfied the applicable statutory law, where the service provider had

_____

child.).

[12] In *Registe*, a detective who was investigating a double murder learned from a third person that the victims were supposed to meet someone named "Mike" on the morning they were killed. The witness had a cell phone number for "Mike." The detective faxed a request to the service provider for the owner of the account and for a log of calls for a two-hour period bracketing the time of the murders. The detective attested, "[o]bviously this suspect presents an immediate danger to any law enforcement officer who may come into contact with this person." The service provider voluntarily released the requested records. See *Registe*, 292 Ga. at 156-157.

20

received information directly from police that its records could help identify an at-large suspect of a double homicide committed within a day of the request and that the suspect presented a present and immediate danger. This supported [the provider's] good faith belief that there was an ongoing emergency, and that belief supported [the provider's] voluntary disclosure of its records [under the SCA, 18 USC § 2702 (c) (4)].

*Registe*, 292 Ga. at 157.[13] Likewise, in this case, we conclude that the detective's communications with MetroPCS supported a good faith belief that its voluntary disclosure of the requested records was authorized under the SCA and binding appellate precedent at the time. See id. at 156-157.

---

[13] In addition to challenging the release of cell phone records under 18 USC § 2702 (c) (4), Registe also argued that the release failed to comply with OCGA § 16-11-66.1 (d), which provides: "A subpoena for the production of stored wire or electronic communications and transactional records pertaining thereto may be issued at any time upon a showing by a law enforcement official, a prosecuting attorney, or the Attorney General that the subpoenaed material relates to a pending criminal investigation." See also OCGA §§ 16-11-62 (defining offenses involving unlawful eavesdropping or surveillance); 16-11-69 (providing punishments for offenses involving unlawful eavesdropping or surveillance). We questioned whether OCGA § 16-11-66.1 applies to voluntary disclosures under 18 USC § 2702 (c) (4), because OCGA § 16-11-66.1 "appears to apply only to *mandatory* disclosures" of electronic communications and related transactional records to law enforcement. *Registe*, 292 Ga. at 157 n.3 (emphasis in original); see id. at 158 (Hunstein, C. J., concurring specially) ("Intended to establish ground rules for the issuance and use of warrants, subpoenas, and other means by which law enforcement can compel the disclosure of information, [OCGA § 16-11-66.1] does not address situations involving voluntary disclosures by service providers.")).

Four years after Lofton's trial, the United States Supreme Court's decision in *Carpenter v. United States*, 585 U. S. ___ (138 SCt 2206, 201 LE2d 507) (2018), marked a shift in constitutional doctrine for the government's acquisition of a person's location information from an electronic communications services provider. The Court concluded that CSLI can be mapped to provide "an all-encompassing record of the [cell phone] holder's whereabouts." Id. at ___ (III) (A) (138 SCt at 2217).

> As with GPS information, the time-stamped [cell-site location] data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations. These location records hold for many Americans the "privacies of life." And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools.

Id. (citations and punctuation omitted).[14] The Court held that,

---

[14] See *Riley v. California*, 573 U. S. 373, 393 (III) (B) (1), 403 (IV) (134 SCt 2473, 189 LE2d 430) (2014) (Modern cell phones, which have "immense storage capacity," with "all they contain and all they may reveal," about a person's private concerns, communications, associations, and past "specific movements down to the minute," "hold for many Americans 'the privacies of life[.]'" (citation omitted)).

"[w]hether the government employs its own surveillance technology[,]" as when it places a tracking device on a suspect's car,[15] "or leverages the technology of a wireless carrier, . . . an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI[,]" despite the fact that the information is held by a third party as part of its business records. Id*.,* ___ U. S. at ___ (III) (138 SCt at 2217).

Because a person has a reasonable expectation of privacy in "the whole of his physical movements" as captured through CSLI, the *Carpenter* Court held, compelling a cell-service provider to turn over a user's historical CSLI is a search under the Fourth Amendment, at least if the CSLI is for seven days or more, and, before such a search, "the Government's obligation is a familiar one — get a warrant." Id. at ___ (III) (A), (IV) (138 SCt at 2217-2221).

---

[15] See *United States v. Jones*, 565 U. S. 400, 407 (132 SCt 945, 181 LE2d 911) (2012) (The government's installation of a GPS tracking device on a target's vehicle, and its use of that device to monitor the vehicle's movements for a period of weeks, was a "physical intrusion of a constitutionally protected area in order to obtain information" and therefore constituted a "search" within the meaning of the Fourth Amendment.).

The Court held that an order issued under 18 USC § 2703 (c) (1) (B) and (d), based on a showing that the government has "reasonable grounds" for believing that the records are "relevant and material to an ongoing investigation,"[16] is not "a permissible mechanism for accessing historical cell-site records" because the required showing by law enforcement "falls well short of the probable cause required for a warrant" and creates a standard that is "a gigantic departure from the probable cause rule" applicable to searches under the Fourth Amendment. *Carpenter*, 585 U. S. at ___ (IV) (138 SCt at 2221) (punctuation omitted).

In *Carpenter*, the Court decided the issue before it narrowly,

---

[16] 18 USC § 2703 (c) (1) provides five circumstances that may authorize a governmental entity to "require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)," including, in subpart (B), when the governmental entity "obtains a court order for such disclosure under subsection (d) of this section[.]" 18 USC § 2703 (d) provides that a court order for disclosure under subsection (c)

> may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.

holding that "accessing seven days of [historical] CSLI constitutes a Fourth Amendment search." *Carpenter*, 585 U. S. at ___ (III) n.3 (138 SCt at 2217). The Court did not reach the question "whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be." Id. In arguing for this Court to reverse the trial court's denial of Lofton's motion to suppress the first tranche of cell phone records, and evidence derived from those records, Lofton seeks an extension of the holding in *Carpenter*: from a government-compelled production of cell phone records under 18 USC § 2703 (c) (1) (B) and (d) to a request under 18 USC § 2702 (c) (4) for the voluntary disclosure of records to address an emergency, and from seven days of historical CSLI to four days of historical CSLI.

Even if we were persuaded that *Carpenter* should be extended in these ways, however, we would not reverse the trial court's decision to admit the historical CSLI evidence in this case unless exclusion would serve the purpose of deterring future Fourth

Amendment violations by law enforcement officers, which is the "sole purpose" of the exclusionary rule. *Davis v. United States*, 564 U. S. 229, 236-237 (II) (131 SCt 2419, 180 LE2d 285) (2011). "For exclusion [of evidence obtained in violation of the Fourth Amendment] to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Id. at 237 (II). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," the benefits of exclusion tend to outweigh the costs. Id. at 238 (II) (citation and punctuation omitted). But, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," then "suppression fails to yield appreciable deterrence, [and] exclusion is clearly unwarranted." Id. at 237-238 (II) (citations and punctuation omitted).

Two "good faith" exceptions to the exclusionary rule are pertinent here.[17] In *Illinois v. Krull*, 480 U. S. 340 (107 SCt 1160, 94

---

[17] The first good faith exception to the exclusionary rule recognized by

LE2d 364) (1987), the United States Supreme Court examined the admissibility of "evidence obtained by an officer acting in objectively reasonable reliance on a statute" that is later declared unconstitutional. Id. at 349 (II) (B). The Court held that such evidence is not subject to the exclusionary rule because "[p]enalizing the officer for the legislature's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment

---

the United States Supreme Court applies where an officer acting with objective good faith obtains a search warrant from a judge or magistrate and acts within the scope of the warrant. See *United States v. Leon*, 468 U. S. 897, 918-921 (III) (B) (104 SCt 3405, 82 LE2d 677) (1984). This Court later held that, "in light of [Georgia's] legislatively-mandated exclusionary rule found in OCGA § 17-5-30[,]" the *Leon* exception to the exclusionary rule is inapplicable in Georgia as a matter of statutory law. *Gary v. State*, 262 Ga. 573, 577 (422 SE2d 426) (1992). See OCGA § 17-5-30 ("A defendant aggrieved by an unlawful search and seizure may move the court . . . to suppress as evidence anything so obtained on the grounds that . . . [t]he search and seizure with a warrant was illegal because . . . there was not probable cause for the issuance of the warrant. . . . If the motion is granted the property . . . shall not be admissible in evidence against the movant in any trial."). Recently, however, this Court found the reasoning of *Gary* to be "unsound" and concluded that OCGA § 17-5-30 "establishes a procedure for applying the exclusionary rule but does not itself require the suppression of any evidence." *Mobley v. State*, 307 Ga. 59, 75 (4) (a) (834 SE2d 785) (2019). We "disavow[ed]" *Gary*'s reasoning and held that *Gary* "does not extend to any context other than the reliance of an officer in good faith upon the validity of a search warrant[.]" *Mobley*, 307 Ga. at 75 (4) (a) (not reaching the question whether the specific holdings of *Gary* and its progeny should be squarely overruled, "a question that would require a consideration of the doctrine of stare decisis"). Thus, *Gary* does not "categorically foreclose the application of any other exception to the exclusionary rule." Id. at 75-76 (4) (a).

violations." Id. at 350 (II) (B) (citation and punctuation omitted). The Court explained that,

> [u]nless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.

Id. at 349-350 (II) (B). The Court held that the exclusionary rule did not apply to evidence seized in objective good faith reliance on "a statute that appeared legitimately to allow a warrantless administrative search" of certain licensed businesses. Id. at 360 (III).

More recently, in *Davis*, the United States Supreme Court applied the same reasoning to searches conducted in objectively reasonable reliance on binding appellate precedent that is later overruled. See 564 U. S. at 241 (III). The Court held that such evidence is not subject to the exclusionary rule because "[a]n officer who conducts a search in reliance on binding appellate precedent

28

does no more than act as a reasonable officer would and should act under the circumstances." Id. (citation and punctuation omitted).

In this case, we have concluded that the detective's communications with MetroPCS supported a good faith belief that the company's voluntary disclosure of the requested records was authorized under the SCA, 18 USC § 2702 (c) (4). We further conclude that it was objectively reasonable for a law enforcement officer in good faith to rely on this statutory mechanism to request records for a cell phone number used by a murder suspect where the request was made less than a day after the murder while the effort to apprehend the suspect was ongoing. See *Krull*, 480 U. S. at 360 (III); *Registe*, 292 Ga. at 157; see also *United States v. Wilson*, 960 F3d 136, 146 (III) (B) (3d Cir. 2020) (holding exclusionary rule did not apply to historical CSLI obtained with a court order applied for in objectively reasonable good faith reliance on 18 USC § 2703 (c) (1) (B) and (d) of the SCA before the statute was abrogated by *Carpenter*); *United States v. Curtis*, 901 F3d 846, 849 (I) (7th Cir. 2018) (same). In addition, we conclude that it was objectively

29

reasonable for a law enforcement officer in good faith to rely on binding appellate precedent that at the time did not recognize any reasonable expectation of privacy in non-content cell phone records contained in the business records of a third party and did not differentiate between historical CSLI and other types of non-content cell phone records, as the *Carpenter* Court would later do. See *Davis*, 564 U. S. at 241 (III); *Reed v. State*, 307 Ga. 527, 535 (2) (b) (837 SE2d 272) (2019); *Registe*, 292 Ga. at 156-157; *Smarr v. State*, 317 Ga. App. 584, 593 (3) (c) (732 SE2d 110) (2012); see also *United States v. Zodhiates*, 901 F3d 137, 143 (I) (2d Cir. 2018) (holding exclusionary rule did not apply to historical CSLI obtained in objectively reasonable good faith reliance on appellate precedent establishing the third-party doctrine before the *Carpenter* Court held that a warrant is required for at least seven days of historical CSLI despite the fact that the information is held by a third party).[18]

---

[18] In *Mobley*, we made clear that "the *Davis* good faith exception is distinct from the *Leon* good faith exception and is not, therefore, foreclosed by the specific holding of *Gary*." 307 Ga. at 78 n.24. We therefore disapprove the Court of Appeals' decision in *Brown v. State*, 330 Ga. App. 488, 492-493 (2) &

Because, at the time of Lofton's trial, a federal statute, 18 USC § 2702 (c) (4), and binding appellate precedent, *Registe*, 292 Ga. at 157, authorized the investigatory conduct at issue, reversing the trial court's decision in this case would have little, if any, additional benefit in deterring future violations of the privacy interests recognized in *Carpenter*. We therefore affirm the trial court's ruling. See *Davis*, 564 U. S. at 241 (III); *Krull*, 480 U. S. at 360 (III).

3. Lofton contends that he received ineffective assistance of counsel. Specifically, he argues that, at the hearing on his motion to suppress, his counsel was constitutionally deficient for failing to adequately cross-examine the detective about the exigent circumstances that allegedly existed when she initially obtained Lofton's MetroPCS phone records without a warrant. He argues that the supposed inadequacy of counsel's cross-examination of the detective prejudiced him by causing the trial court to deny his

n.6 (767 SE2d 299) (2014) (citing *Gary* and holding that Georgia does not recognize the *Davis* good faith exception to the exclusionary rule and that, therefore, a warrantless search incident to a DUI arrest of the arrestee's cell phone to view photos stored on the phone "was illegal regardless whether the officer reasonably relied on existing case law").

motion to suppress.

To succeed on his claim of ineffective assistance of counsel, Lofton "must prove both that his lawyer's performance was professionally deficient and that he was prejudiced as a result." *Styles v. State*, 309 Ga. 463, 471 (5) (847 SE2d 325) (2020) (citation and punctuation omitted). See also *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984).

> The scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel. More specifically, the extent of cross-examination is a strategic and tactical decision. Decisions about cross-examination do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances.

*Gaston v. State*, 307 Ga. 634, 642 (2) (d) (837 SE2d 808) (2020) (citations, punctuation and emphasis omitted).

The transcript of the hearing on Lofton's motion to suppress shows that counsel questioned the detective at length and elicited testimony about the circumstances that existed when she requested the records from MetroPCS. Lofton fails to specify any question or

line of inquiry that counsel failed to pursue. As a result, he has not established a reasonable probability that the result of his trial would have been different absent counsel's alleged deficiencies. See *Wainwright v. State*, 305 Ga. 63, 69 (3) (823 SE2d 749) (2019) (Mere speculation that counsel failed to properly cross-examine witness is not enough to show prejudice on ineffective assistance of counsel claim.); *Baker v. State*, 293 Ga. 811, 815 (3) (750 SE2d 137) (2013) (same). And "if an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Wainwright*, 305 Ga. at 69 (3) (citation and punctuation omitted). Lofton's claim of ineffective assistance of counsel therefore fails.

4. Lofton contends that the trial court erred in allowing certain exhibits to go out with the deliberating jury in violation of the continuing witness rule. Specifically, he contends that the trial court erred in sending out State's Exhibit 15, a six-person photo lineup on which Brown circled Lofton's photo and wrote "Lil Tony" under the photo, and State's Exhibit 14, a form that Brown filled out after

33

viewing the lineup, including an indication that it took him ten seconds or less to pick out the person who committed the crime and that he knew the person he identified as Lil Tony. Lofton also contends that the trial court erred in sending out MetroPCS phone records that included subscriber information and call detail records with tower location information for the period October 1 through 20, 2013, for Lofton's phone (State's Exhibit 42), Eatmon's phone (State's Exhibit 43), and Brown's phone (State's Exhibit 44). Finally, Lofton contends that the trial court erred in sending out State's Exhibit 45B, a printout of text messages for Lofton's phone for the day of the shooting, and State's Exhibit 46, a list of cell phone towers in the Atlanta area with the street address of each tower.

The continuing witness rule of Georgia law "regulates which documents or recordings go into the jury room with the jury during deliberations and which ones do not." *Clark v. State*, 296 Ga. 543, 548-549 (4) (769 SE2d 376) (2015). As we have explained,

> the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard

34

when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations.

*Keller v. State*, 308 Ga. 492, 505-506 (9) (842 SE2d 22) (2020) (citation and punctuation omitted). See also *Rainwater v. State*, 300 Ga. 800, 802 (2) n.3 (797 SE2d 889) (2017) (noting that the continuing witness rule was unaffected by the enactment of the current Evidence Code).

Here, none of the challenged exhibits were written testimony, nor did they derive their evidentiary value solely from the credibility of the makers of the exhibits. See *Clarke v. State*, 308 Ga. 630, 636 (4) (842 SE2d 863) (2020); *Keller*, 308 Ga. at 505-506 (9). Instead, they were original documentary evidence and were properly allowed to go out with the jury. See *Clarke*, 308 Ga. at 636 (4); *Keller*, 308 Ga. at 505-506 (9); *Wilkins v. State*, 291 Ga. 483, 488 (6) (731 SE2d 346) (2012).

5. Lofton contends that he received ineffective assistance of

counsel after the trial court denied his request, made just before jury selection, to discharge his court-appointed counsel and to replace appointed counsel with retained counsel. After hearing Lofton's request, the trial court also agreed to hear from Lofton's father on the issue. The trial court stated that, because Lofton had filed a demand for a speedy trial and had known of the date set for trial with adequate time to retain new counsel, the court would not grant a continuance for that purpose. See *Lane v. State*, 299 Ga. 791, 794 (2) (792 SE2d 378) (2016) ("[W]hile every defendant has the right to hire counsel, a defendant must use reasonable diligence in obtaining retained counsel. A defendant may not use a request for change of counsel as a dilatory tactic." (citations and punctuation omitted)). The trial court then allowed Lofton and his father to confer privately with Lofton's appointed counsel. After that private conference, Lofton abandoned his request to discharge his appointed counsel.

The assistance of counsel is not ineffective solely because the client would have preferred a different lawyer. See *McCullough v. State*, 304 Ga. 290, 296 (2) (b) (818 SE2d 520) (2018). And Lofton did

36

not preserve for our review any error in the trial court's declining his request to change counsel because he withdrew his request. See *Phillips v. State*, 279 Ga. 704, 705 (1) (620 SE2d 367) (2005); *Anderson v. State*, 276 Ga. App. 216, 217 (1) (622 SE2d 898) (2005).

6. Lofton contends that the State exercised its jury strikes with racially discriminatory intent and that the trial court erred in rejecting his challenge to the jury under *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986). Specifically, Lofton contends that the State, which used nine peremptory jury strikes and struck seven African American jurors, exercised its jury strikes in a racially discriminatory manner.

A *Batson* challenge involves three steps:

(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.

*Thomas v. State*, 309 Ga. 488, 490 (2) (847 SE2d 147) (2020) (citation omitted). "[A] trial court's finding as to whether the opponent of a

37

strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous." *Jackson v. State*, 291 Ga. 25, 26-27 (2) (727 SE2d 120) (2012).

In this case, the threshold issue of whether Lofton made a prima facie showing of racial discrimination is moot, because the State, on the record, offered race-neutral explanations for each of the challenged strikes. See *Lord v. State*, 304 Ga. 532, 536 (3) (820 SE2d 16) (2018); see also *Pye v. State*, 269 Ga. 779, 780 (1) (505 SE2d 4) (1998) ("The record shows that the State gave reasons for [each of the challenged] peremptory strikes, rendering the necessity of a preliminary showing of prima facie discrimination moot."). "At step two [of a *Batson* analysis], the proponent of the strike need only articulate a facially race-neutral reason for the strike. Step two does not demand an explanation that is persuasive, or even plausible." *Taylor v. State*, 303 Ga. 624, 631-632 (3) (814 SE2d 353) (2018) (citations and punctuation omitted). "[B]oth the United States Supreme Court and this Court have squarely held that a peremptory strike based upon a juror's demeanor during voir dire may be race-

neutral at *Batson* step two." Id. (citations and punctuation omitted).

Here, the State gave race-neutral explanations for the strikes. See

*Myrick v. State*, 306 Ga. 894, 899 (2) (b) (834 SE2d 542) (2019).[19]

"[A]t the third step of the *Batson* analysis, the trial court makes

credibility determinations, evaluates the persuasiveness of the

strike opponent's prima facie showing and the explanations given by

the strike proponent, and examines all other circumstances that

bear upon the issue of racial animosity." *Thomas*, 309 Ga. at 491 (2)

(citation and punctuation omitted). A trial court's finding that the

prosecutor's reasons for the peremptory strikes were not racially

---

[19] The State explained that prospective Juror Number 8 was removed because the juror felt that she would have a "hard time disassociating" this case from her negative feelings about her daughter serving as a State trooper; Juror Number 11 was "vague" in her responses during voir dire and the prosecutor believed that the juror was not forthcoming about her feelings regarding her father's substance abuse problems; Juror Number 16 was extremely familiar with the locations of the gas stations and apartments where events at issue took place; Juror Number 25 did not seem to understand the questions posed during voir dire and was not forthcoming in her responses; Juror Number 29 seemed indifferent to his children and also seemed deceitful in his answers about his familiarity with the incident locations; Juror Numbers 38 and 39 were not objectionable to the prosecutor, but she struck them "purely strategically" because she felt Juror Number 40 would be particularly sympathetic to the victim because her brother also had abused prescription drugs.

motivated, "like most *Batson* decisions, turn[s] largely on an evaluation of the credibility of the attorney who made the strikes, and evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Johnson v. State*, 302 Ga. 774, 780 (3) (b) (809 SE2d 769) (2018) (citations and punctuation omitted). We discern no basis for concluding that the trial court's determination that Lofton failed to prove discriminatory intent is clearly erroneous; therefore, we affirm. See *Taylor*, 303 Ga. at 633-635 (3); *Johnson*, 302 Ga. at 782 (3) (b).

7. Lofton contends that the trial court erred in denying his request that the jury be instructed that the testimony of an accomplice alone is not sufficient to warrant a conviction but must be corroborated by other evidence of the guilt of the accused.[20] Specifically, Lofton argues that Eatmon was an accomplice in the

---

[20] See OCGA § 24-14-8 (In "prosecutions for . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient [to establish a fact]. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness" in such cases.).

"string of crimes" on the day of the shooting, in that he "orchestrated" the drug deal.

"In considering whether a witness is an accomplice, we look to the definition of party to a crime found in OCGA § 16-2-20." *Walter v. State*, 304 Ga. 760, 766 (3) (b) (822 SE2d 266) (2018). Under that statute, "[a] person is concerned in the commission of a crime . . . if he . . . [i]ntentionally aids or abets in the commission of the crime; or [i]ntentionally advises [or] encourages . . . another to commit the crime." OCGA § 16-2-20 (b) (3), (4). "Mere presence at the commission of a crime does not render the spectator an accomplice." *Christian v. State*, 277 Ga. 775, 776 (1) (596 SE2d 6) (2004). Rather, there must be some evidence showing that the person "shared a common criminal intent to commit the crimes in question with the actual perpetrators." *Higuera-Guiterrez v. State*, 298 Ga. 41, 43 (2) (779 SE2d 288) (2015). Criminal intent may be inferred from the person's conduct before, during, and after the crimes. Id.

"There must be at least slight evidence produced at trial to authorize a jury instruction, and whether the evidence presented is

sufficient to authorize a charge is a question of law." *Rammage v. State*, 307 Ga. 763, 767 (4) (838 SE2d 249) (2020) (citation and punctuation omitted). See also *Barron v. State*, 297 Ga. 706, 708 (2) (777 SE2d 435) (2015) ("A request to charge has to be legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence." (citation and punctuation omitted)). Thus, it is not error to fail to give a requested jury instruction regarding the corroboration required for accomplice testimony where there is no evidence that the witness shared a common criminal intent with the defendant to commit the crimes charged. See *Yeomans v. State*, 229 Ga. 488, 493 (5) (192 SE2d 362) (1972); *Parks v. State*, 294 Ga. App. 646, 651 (7) (669 SE2d 684) (2008); see also *Thornton v. State*, 307 Ga. 121, 125 (2) (c) (834 SE2d 814) (2019) (no obvious error in failing sua sponte to instruct the jury on corroboration of accomplice testimony where there was no evidence that a witness shared a common criminal intent with the defendant in shooting the murder victim); *Stripling v. State*, 304 Ga. 131, 136 (2) (816 SE2d 663) (2018) (same).

Although there was evidence in this case that Eatmon shared a common criminal intent with Lofton for the drug deal to take place, there was no evidence that Eatmon shared a common criminal intent with Lofton for any of the crimes charged: murder, armed robbery, aggravated assault, and possession of a firearm. There was no evidence that Eatmon even knew Lofton was armed and prepared to shoot Eatmon's associate, Walker. And Eatmon's conduct after the shooting did not aid or abet Lofton in the crimes charged; rather, Eatmon drove Walker to the hospital, and his cooperation with the detectives and with the prosecutors directly contributed to Lofton's apprehension and conviction. The trial court did not err in refusing to instruct the jury to determine whether Eatmon was an accomplice or in failing to charge the jury on the corroboration necessary for the testimony of an accomplice. See *Yeomans*, 229 Ga. at 493 (5); *Parks*, 294 Ga. App. at 651 (7).

*Judgment affirmed. All the Justices concur, except Melton, C. J., who concurs in judgment only in Division 7.*

DECIDED FEBRUARY 15, 2021.

Murder. Fulton Superior Court. Before Judge Schwall.

*Brownstone, P.A., Robert L. Sirianni, Jr.*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, David K. Getachew-Smith, Sr., Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.